**RICHARD R. BEST**
**REGIONAL DIRECTOR**
**Lara S. Mehraban**
**Wendy Tepperman**
**Paul G. Gizzi**
**Bennett Ellenbogen**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**212-336-0077 (Gizzi)**
**Email: gizzip@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| Plaintiff, | **21 Civ. _____ (    )** |
| -against- | |
| **JAMES DAVID O'BRIEN,** | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendant James David O'Brien ("O'Brien"), alleges as follows:

**SUMMARY**

1.      From at least September 2015 to October 2020, Defendant O'Brien engaged in a

fraudulent multi-million dollar market manipulation scheme through coordinated trading

between multiple accounts maintained in his or his wife's name at different brokerage firms.

The design and intent of O'Brien's scheme was to create the false appearance of trading interest

and activity in particular stocks to enable him to purchase stocks at artificially low prices and then quickly sell them at artificially high prices.

2.      O'Brien simultaneously traded stocks in two or more accounts at separate brokerage firms in a coordinated manner.  O'Brien generally accumulated larger stock positions in one or more accounts at one brokerage firm (hereinafter referred to as the "winner" accounts), and placed smaller orders in the same securities on the opposite side of the market in one or more accounts at a different brokerage firm (hereinafter referred to as the "helper" accounts).

3.      O'Brien used helper account trades (i) to decrease the price of the security *before* he acquired it in the winner accounts, and/or (ii) to increase the price of the security *after* he acquired it in the winner accounts.  O'Brien then sold the securities in the winner accounts, seeking to generate a net profit across all of the involved accounts.

4.      Through this repetitive trading activity, O'Brien engaged in a manipulative trading scheme with the intent to induce other market participants to fill his orders at artificially inflated or deflated prices.

5.      During the period from September 2015 through at least October 2020, O'Brien used at least eighteen brokerage accounts in his or his wife's name at fourteen different brokerage firms to conduct these "coordinated trading events."  During this period, O'Brien executed approximately 18,000 coordinated trading events, with approximately seventy-five percent of these coordinated trading events resulting in net profits across the involved accounts.

6.      O'Brien's scheme was very profitable.  O'Brien obtained more than $9.6 million in net profits from his successful (*i.e.*, net profitable) coordinated trading events, and he netted an aggregate of approximately $5.8 million from all of his coordinated trading events (*i.e.,* aggregating both net profitable and net unprofitable coordinated trading events).

7.      Brokerage firms repeatedly raised concerns about O'Brien's trading and closed his accounts, but he simply opened accounts at different brokerage firms and carried on the same conduct.  O'Brien also sought to mislead certain of the brokerage firms and/or concealed from them his trading in the same securities in other accounts.  Even after the Commission began investigating him, and filed an action to enforce an investigative testimony subpoena, O'Brien continued to engage in the same trading activity.

## VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, Defendant has violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)], and Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

9.      Unless Defendant is restrained and enjoined, Defendant will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.      The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

11.      The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws this Complaint alleges he has violated; (b) ordering Defendant to disgorge all ill-gotten gains and/or unjust enrichment received as a result of the violations alleged herein and to pay prejudgment interest thereon, pursuant to Exchange Act

Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Defendant to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

13.     Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Defendant may be found in, is an inhabitant of, or transacts business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.  For example, O'Brien carried out his manipulative trading through accounts and trading platforms maintained in this District.

## DEFENDANT[1]

15.     **O'Brien,** age 50, is a resident of Gibbsboro, New Jersey.  Since 2013, O'Brien has generally described himself on brokerage account opening documents as a trader or as self-employed.  O'Brien was previously employed at a number of brokerage firms beginning in 1994, most recently at a registered brokerage firm from 2006 until his employment was terminated in

---

[1] O'Brien consented to tolling that suspended the running of any applicable statute of limitations from February 24, 2020 to April 23, 2021.

2013.  O'Brien formerly held Series 7, 9, 10, 55, and 63 licenses.  In the investigation that preceded this action, O'Brien refused to comply with an investigative subpoena.  O'Brien was later ordered to testify in the investigation.  *SEC v. O'Brien,* 19-misc-468 (KPF), 2019 WL 7207485 (S.D.N.Y. Dec. 27, 2019), *aff'd,* 842 Fed. App'x 652 (2d Cir. 2021), *cert. denied,* No. 20-1727, 2021 WL 3507822 (U.S. Oct. 4, 2021).  In the court-ordered testimony, O'Brien asserted his Fifth Amendment privilege against self-incrimination to questions concerning his trading strategies and trading activities.

## FACTS

I.   **O'BRIEN ENGAGED IN A PATTERN OF COORDINATED TRADING THROUGH ACCOUNTS AT DIFFERENT BROKERAGE FIRMS**

16.     Between September 17, 2015 and at least October 29, 2020, O'Brien carried out approximately 18,000 "coordinated trading events" in eighteen accounts at fourteen different brokerage firms (the "Coordinated Accounts").

17.     As used in this complaint, a "coordinated trading event" is defined as follows:

- Two or more accounts trade and hold positions in the same exchange traded stock, on the same day, and during the same period of time;

- The event starts when the first account trades and ends when all of the involved accounts close out their positions (or when the trading day ends);

- At least one of the accounts behaves as a winner account—an account that has an average transaction size greater than or equal to 1,000 shares; and

- At least one of the involved accounts behaves as a helper account—an account that has an average transaction size of less than 500 shares and is held at a different brokerage firm than the winner account.

18.     Generally, O'Brien's trading in the helper accounts was designed and intended to artificially affect the price of the stock traded in a particular coordinated trading event in order to assist the winner accounts in generating profits.

19.     O'Brien's coordinated trading generally followed consistent patterns.

20.     In some coordinated trading events, O'Brien first sought to create an artificially lower market price for a stock by placing a series of smaller sell orders in that stock in helper accounts.

21.     O'Brien's purpose and effect of placing smaller orders in the helper accounts was to create the false appearance of sell-interest in the stock to decrease the price of the security before he acquired his larger positions in the same security at artificially low prices in the winner accounts held at different brokerage firms from the helper accounts.

22.     Once the winner accounts were finished buying the particular stock, O'Brien often cancelled remaining open helper account sell orders.

23.     In other coordinated trading events, O'Brien started the event by establishing a position in a stock in winner accounts.

24.     After acquiring the larger position in the winner accounts, O'Brien generally engaged in the same manipulation on the opposite side of the market to realize a profit from the scheme.

25.     To sell the winner account position at an artificially high price, O'Brien placed a series of smaller buy orders in the helper accounts to artificially increase the price of the security so he could sell his larger winner account positions at a profit.

26.     Once O'Brien liquidated winner account positions, O'Brien often cancelled remaining open helper account buy orders and liquidated any remaining smaller positions in the helper accounts.

27.     O'Brien's trading strategy sought to generate profits for the winner accounts that exceeded any accrued losses in the helper accounts from their smaller positions.

6

28.     In this way, O'Brien used the helper accounts to enable and improve the profitability of the trading in the winner account.

29.     Through thousands of coordinated trading events, O'Brien intended to induce other market participants to sell shares to and purchase shares from his winner accounts at artificial prices moved by the helper account orders.

30.     The helper account orders and trades would often change the National Best Bid and Offer ("NBBO")[2] price, and thereby enabled and enhanced the winner account's profitability.

31.     O'Brien was successful in generating net profits across the involved accounts in coordinated trading events approximately seventy-five percent of the time and he reaped more than $9.6 million in net profits from these successful (*i.e.*, net profitable) coordinated trading events.

32.     In all, O'Brien's coordinated trading events involved over $10.4 billion dollars used to purchase the securities involved in the events, over 297 million shares traded, and a total of at least 2,119 different stocks.

**A.      O'Brien's Trading from September 2015 to December 2016**

33.     O'Brien's most active period of conducting coordinated trading events occurred between mid-September 2015 and December 2016.

34.     During this period, O'Brien engaged in approximately 11,738 coordinated trading events, which averaged thirty-six per trading day and used ten Coordinated Accounts at eight separate brokerage firms.

---

[2] Rule 611 of Regulation NMS generally prevents trading centers from executing orders at prices that are outside the NBBO.

35.     The table below summarizes the approximate profits (or losses) in relation to the number of accounts used per coordinated trading event during this period:

### James O'Brien Coordinated Trading Events
#### September 2015 - December 2016

| Number of Accounts Trading an Event | Number of Events | # of Net Profitable Events | Profits on Net Profitable Events | Average Profit Per Net Profitable Event | Losses on Net Unprofitable Events | Average Loss per Net Unprofitable Event | Net Gain from All Events |
|---|---|---|---|---|---|---|---|
| 2 | 8,653 | 6,413 | 3,288,017 | $513 | -$986,533 | -$440 | $2,301,484 |
| 3 | 2,877 | 2,235 | 1,821,263 | $815 | -$539,700 | -$841 | $1,281,563 |
| 4 | 205 | 155 | 333,466 | $2,151 | -$118,434 | -$2,369 | $215,032 |
| 5 | 3 | 2 | 2,809 | $1,405 | -$195,149 | -$195,149 | -$192,340 |
| Total | 11,738 | 8,805 | $5,445,555 | $618 | -$1,839,816 | -$627 | $3,605,738 |

36.     As reflected in the table, approximately seventy-five percent of O'Brien's coordinated trading events during this period resulted in net profits across the Coordinated Accounts used.

37.     These coordinated trading events generated more than $5.4 million in profits on O'Brien's net profitable coordinated trading events, with an average profit of $618 per such event.

38.     Even deducting net unprofitable coordinated trading events (*e.g.*, events where helper account losses exceeded any winner account gains or where the winner accounts experienced losses), O'Brien still obtained a net gain overall of more than $3.6 million for this period from all of his coordinated trading events.

39.     In the aggregate, O'Brien's coordinated trading events during this period involved more than 189 million shares traded, and involved more than $6 billion invested to purchase the shares involved in the coordinated trading events.

40.     An example of a coordinated trading event during this period is detailed in

Appendix A.

    **B.**    **O'Brien's Trading from January 2017 to October 2020**

    41.    O'Brien reduced his coordinating trading beginning in mid-December 2016, but he continued engaging in coordinated trading events through at least October 2020.

    42.    Overall, between January 2017 and October 2020, O'Brien engaged in at least 6,303 coordinated trading events through at least nine Coordinated Accounts at seven different brokerage firms.

    43.    The table below details the profits (or losses) in relation to the number of accounts used per coordinated trading event during this period:

**James O'Brien Coordinated Trading Events**
**January 1, 2017 - October 31, 2020**

| Number of Accounts Trading an Event | Number of Events | # of Net Profitable Events | Profits on Net Profitable Events | Average Profit Per Net Profitable Event | Losses on Net Unprofitable Events | Average Loss per Net Unprofitable Event | Net Gain from All Events |
|---|---|---|---|---|---|---|---|
| 2 | 5,148 | 3,873 | 3,258,875 | $841 | -$1,346,232 | -$1,056 | $1,912,642 |
| 3 | 1,120 | 754 | 884,031 | $1,172 | -$598,597 | -$1,636 | $285,434 |
| 4 | 33 | 18 | 19,135 | $1,063 | -$48,628 | -$3,242 | -$29,493 |
| 5 | 1 | 1 | 6 | $6 | | | $6 |
| 7 | 1 | | | | -$3,736 | -$3,736 | -$3,736 |
| **Total** | **6,303** | **4,646** | **$4,162,047** | **$896** | **-$1,997,193** | **-$1,205** | **$2,164,853** |

    44.    As reflected in the table, approximately seventy-four percent of the coordinated trading events during this period resulted in net profits across the Coordinated Accounts used in the event.

    45.    O'Brien generated more than $4.1 million in profits on his net profitable coordinated trading events for this period, with an average profit of $896 per such event.

    46.    Even deducting the net losses from net unprofitable coordinated trading events (*e.g.,* events where helper account losses exceed winner account gains or where the winner account experienced losses), O'Brien still obtained a net gain of more than $2.1 million for this

period from all of his coordinated trading events.

47.    In the aggregate, O'Brien's coordinated trading events during this period involved over 107 million shares traded, and involved approximately $4 billion invested to purchase the shares involved in the coordinated trading events.

48.    An example of a coordinated trading event during this period is detailed in Appendix B.

## II.    O'BRIEN REPEATEDLY RECEIVED COMPLIANCE WARNINGS FROM BROKERAGE FIRMS, LIED ABOUT HIS TRADING STRATEGY, AND HAD HIS ACCOUNTS CLOSED

49.    O'Brien attempted to conceal his coordinated trading activity by executing the winner and helper trades in accounts at different broker-dealers.

50.    Brokerage firms could observe O'Brien's trading activities at their own firm, but did not have visibility into his trading at other firms.

51.    Despite this limited visibility, however, O'Brien's trading still triggered warnings for manipulative trading activity.

52.    Brokerage firms identified O'Brien's trading as involving potentially manipulative trades, such layering or wash trades.

53.    While the warnings sent to O'Brien did not relate to coordinated trading in multiple accounts, those warnings did provide general notice to O'Brien on the concepts of prohibited manipulation.

54.    For example, in October 2015, Broker-Dealer A sent O'Brien warnings about potential manipulative trading activity.

55.    While the instance identified by Broker-Dealer A involved an apparent wash trade, the warnings explained what constitutes a manipulative trading practice.

56.     Specifically, one such email explained that manipulative trading practices involve any trades that have the purpose of "[c]reating or inducing a false, misleading, or artificial appearance of activity in the security" or "setting a price that does not reflect the true state of the market in the security."

57.     These types of alerts also warned O'Brien that manipulative trading practices are serious violations of exchange trading rules that may result in regulatory penalties.

58.     As another example, in March 2016, Broker-Dealer B provided a warning to O'Brien related to instances of layering in his account, which it stated is a manipulative trading practice, and provided O'Brien with a description of what layering is.

59.     At the time he received this warning, O'Brien was using the Broker-Dealer B account as his helper account.

60.     The description of layering Broker-Dealer B provided explained that it "involves the placement of multiple, non-bona fide, limit orders on one side of the market at various price levels . . . to create the appearance of a change in the levels of supply and demand, thereby artificially moving the price of the security.  An order is then executed on the opposite side of the market at the artificially created price, and the non-bona fide orders are immediately canceled."

61.     The warning from Broker-Dealer B, which only had visibility into the helper account side of O'Brien's activity, described the conduct as follows:

- Starting at 12:27:47.919, this account was flat CRR and starting entering multiple buy orders, some filled some sitting on the book.
- By 12:28:26.093, this account had 7 different bids resting with at least 50% of the volume offered at the respective price levels.
- At 12:28:37.294 this account entered a sell order which was filled in full by 12:28:40.000
- Then at 12:28:41.000 all resting buy orders were mass cancelled.

> The multiple buy orders, layered in the book at different routes are
> considered 'non-bonafide' (as they were all mass cancelled after the
> sell execution), routed to give the impression of market strength on the
> bid, while the sell order was the intended trade.

62.     Among other things, this warning provided O'Brien with notice that structuring

trades to provide an appearance of market strength, then making the real intended trade on the

opposite side of the market, and cancelling any unfilled orders that remain, would constitute

manipulative trading activity—which was indeed very similar to O'Brien's overall strategy even

though Broker-Dealer B only had visibility to the helper account activity.

63.     At least one brokerage firm, Broker-Dealer F, directly asked O'Brien whether he

engaged in coordinated trading.

64.     Specifically, in March 2019, Broker-Dealer F wrote in an email to O'Brien the

following:

> [T]rading activity in National General Hlgs (NGHC) on March 20, 20129 where your
> account appeared to submit multiple sell orders [in less than a minute] that appeared to
> contribute to the market quote narrowing from 24.31/24.77 to 24.26/24/34.  In addition,
> we noted your account submitting buy orders over [a period of approximately 30
> seconds] that appeared to contribute to the market quote moving from 24.11/24.53 to
> 24.36/24.49.  Please provide a written explanation regarding your investment strategy and
> rational for order placement NGHC.  Do you coordinate your trading with other accounts
> or individuals outside of [Broker-Dealer F]?

65.     Approximately three weeks later, O'Brien responded generally to the email, but

notably did not answer whether he coordinated trading with other accounts or individuals.

66.     That day, Broker-Dealer F responded, repeating the question: "Would you please

confirm the below question?  Do you coordinate your trading with other accounts or individuals

outside of [Broker-Dealer F]?"

67.     O'Brien responded, "I don't coordinate with other individuals . . . .  I mostly trade

off of Upgrades or recommendations on CNBC."

68.     O'Brien notably was silent as to the fact that he was coordinating his trades with trades in his accounts at other brokerage firms.

69.     Further, his response was misleading when he stated that he traded on upgrades and recommendations.

70.     As alleged above, the Coordinated Accounts O'Brien used were frequently closed by brokerage firms.

71.     When this occurred, O'Brien repeatedly opened new accounts elsewhere in his name, or in his wife's name, so he could continue his coordinated trading scheme.

72.     For example, after generating several million dollars in profits from coordinated trading events using accounts in both his and his wife's names at Broker-Dealer C, the firm shut down these accounts on October 27, 2016.

73.     The closures followed shortly after an inquiry made to O'Brien regarding his trading strategies (as alleged below).

74.     The next day, O'Brien opened an account, in his name, at Broker-Dealer D, and approximately one week later, O'Brien opened two accounts in his wife's name at Broker-Dealer E.

75.     O'Brien then continued conducting coordinated trading events using these new accounts.

76.     Similarly, after Broker-Dealer A closed his account in late October 2015, a few weeks after sending the warning notice as alleged above, O'Brien increased his usage of an account at a different brokerage firm, Broker-Dealer E, in his coordinated trading events.

77.     In the following months, O'Brien opened new accounts at two additional brokerage firms, Broker-Dealer G and Broker-Dealer H, and he used them to continue engaging

in coordinated trading events.

78.    O'Brien never disclosed his coordinated trading strategy when firms contacted

him with questions about his trading.

79.    For instance, in October 2016, a Broker-Dealer C branch manager was asked in

an email from the compliance department to

> contact [O'Brien] to discuss the trading in his account. We'd like you to ask him
> how he chooses which stocks to trade; i.e., does he go by fundamental analysis,
> technical analysis, focus on specific sectors/industries, etc.? Also, please ask him
> if he is using a 3rd party service (aside from what the firm provides) such as a
> website or automated trading software. As I said on the phone, this is somewhat
> time sensitive. Hopefully, you are able to get in touch with him and will not have
> to resort to leaving a message, telling him his internet access will be set to View
> Only until he returns your call.

80.    The branch manager later responded in an email that he had spoken with O'Brien,

and that O'Brien had told the branch manager that he "[l]ooks primarily at momentum stuff,

buys when it falls 30/40 cents, likes to try to catch a bounce. Likes to stay in the same stocks he

knows. Says he doesn't use software. 'Trades the news'.  Not actively scanning."

81.     In fact, ninety-nine percent of the gains realized in O'Brien's accounts at Broker-

Dealer C since opening in August 2016 and through October 2016 were attributable to

coordinated trading events in which O'Brien used his Broker-Dealer C accounts as winner

accounts.

82.    As such, contrary to his representations to the Broker-Dealer C branch manager

that he was "looking at momentum stuff" to buy when a stock happened to have just dropped,

"trying to catch a bounce," and "trading the news," O'Brien himself was creating that

momentum and bounce through his helper account trades.

83.    Approximately two weeks later, Broker-Dealer C closed his accounts.

84.    In light of brokerage firms questioning his trading strategy and the warnings he

received, O'Brien therefore had to have understood that the firms would not permit him to conduct such trading while knowing that he was simultaneously trading in the same security on the opposite side of the market.

85.     O'Brien therefore had to have understood that his manipulative trading strategy would not work if attempted within the same account.

## III.   O'BRIEN CONTINUED TO ENGAGE IN COORDINATED TRADING EVENTS DESPITE KNOWING THAT THE COMMISSION STAFF WAS INVESTIGATING HIM

86.     As alleged above, O'Brien reduced the frequency of his coordinated trading events in mid-December 2016, but he continued to engage in coordinated trading events through at least October 2020.

87.     O'Brien continued to engage in coordinated trading events even after learning that the Commission was investigating him.

88.     In May 2018, the Commission subpoenaed O'Brien related to his trading activities.

89.     O'Brien provided a proffer to the Commission staff (and criminal authorities) in August 2018.

90.     In May 2019, the Commission again subpoenaed O'Brien to provide testimony.

91.     In October 2019, after O'Brien refused to appear for testimony, the Commission filed a subpoena enforcement proceeding seeking a court order to compel O'Brien to testify.

92.     In December 2019, a court ordered O'Brien to testify.

93.     The court stayed O'Brien's obligation to testify while he appealed the order.

94.     O'Brien's appeal was fully briefed in the fall of 2020, and was argued and denied in early 2021.

95.     O'Brien continued to engage in coordinated trading events throughout the period

he was aware of the Commission's investigation, from at least May 2018 through at least

October 2020.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Sections 17(a)(1) and (3)

96.     The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 95 and Appendices A and B.

97.     Defendant, directly or indirectly, singly or in concert, in the offer or sale of

securities and by the use of the means or instruments of transportation or communication in

interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices,

schemes or artifices to defraud, and/or (2) knowingly, recklessly, or negligently has engaged in

one or more transactions, practices, or courses of business which operated or would operate as a

fraud or deceit upon the purchaser.

98.     By reason of the foregoing, Defendant, directly or indirectly, has violated and,

unless enjoined, will again violate Securities Act Sections 17(a)(1) and (3) [15 U.S.C.

§§ 77q(a)(1) and (3)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) Thereunder

99.     The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 95 and Appendices A and B.

100.     Defendant, directly or indirectly, singly or in concert, in connection with the

purchase or sale of securities and by the use of means or instrumentalities of interstate

commerce, or the mails, or the facilities of a national securities exchange, knowingly or

recklessly has (i) employed one or more devices, schemes, or artifices to defraud, and/or (ii)

engaged in one or more acts, practices, or courses of business which operated or would operate

as a fraud or deceit upon other persons.

101.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 9(a)(2)

102.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 95 and Appendices A and B.

103.    Defendant, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

104.    By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 9(a)(2) [15 U.S.C. § 78i(a)(2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Defendant and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)], and Exchange Act Sections 9(a)(2) and 10(b) [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rules 10b-5(a)

and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)];

## II.

Ordering Defendant to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

## III.

Ordering Defendant to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

## IV.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: New York, New York
       November 18, 2021

*Richard R. Best*
_____
RICHARD R. BEST
REGIONAL DIRECTOR
Lara S. Mehraban
Wendy Tepperman
Paul G. Gizzi
Bennett Ellenbogen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
212-336-0077 (Gizzi)
Email: gizzip@sec.gov

## APPENDIX A

**Example of One of O'Brien's Coordinated Trading Events on September 29, 2016**

On September 29, 2016, O'Brien conducted 106 coordinated trading events in 24 different stocks, one of which was Silicon Laboratories ("SLAB"), which is traded on the NASDAQ. There were 14 separate coordinated trading events in SLAB that day. In one 37-second period, from roughly 9:44:44 AM to 9:45:21 AM, two of the Coordinated Accounts traded, netting profits across both accounts of approximately $5,458. During that time period, these trades constituted roughly 84% of the SLAB shares traded in the market. This 37-second period of trading illustrates O'Brien's coordinated trading activity:

1. **Helper account sells (driving down price of security):** The event begins with eight sell limit orders in the Broker-Dealer B helper account in SLAB for 100 shares each, entered between 9:44:44 and 9:45:02. Each of these orders is lower or the same price as the last, beginning at $57.55 and ending at $57.01. This account is acting as a helper account to push the price of SLAB down before and while the winner account begins accumulating. Half of the eight helper account orders are executed in full at an average price of $57.06.

2. **Winner account buys (accumulating position in security):** While the helper account is selling, O'Brien placed and executed three market orders for 2,700 shares each to purchase a total of 8,100 shares of SLAB in the winner account held at Broker-Dealer C. The orders were executed between 9:44:54 and 9:45:04 for an average of $57.07 per share.

3. **Helper account buys (increasing price of security):** Once the winner account accumulated its 8,100 share position, the helper account begins with a 300 share market order purchase and then enters 11 buy limit orders between 9:45:07 and 9:45:12, for 100 shares each, between $57.38 and $57.76 per share. These orders are to create or enhance a price spike following the rapid series of buys that were made in the winner account mere fractions of a second earlier. Four of the buy limit orders were executed in full and one executed 20 shares, at prices ranging from $57.38 to $57.75. During the time when these buy limit orders were entered to when the last was executed, the NBBO moved from $56.74 - $57.19 to $57.65 - $57.93. The remaining shares of the 7 buy limit orders were cancelled.

4. **Winner account sells (liquidating position in security):** As the Broker-Dealer B account was helping to increase the price of SLAB, the Broker-Dealer C winner account quickly entered three market sell orders for 2,700 shares, executing all 8,100 shares at $57.76 between 9:45:14 and 9:45:18, netting $5,591.

5. **Helper account closes position:** The coordinated trading event came to a close when the Broker-Dealer B account closed its small acquired position of 320 shares of SLAB with sell limit orders between 9:45:20 and 9:45:21, for a total loss of $133.

Thus, O'Brien used the helper accounts to push the price of SLAB down before and while acquiring the larger position in the winner account and then used the helper account to push the price of SLAB up after acquiring the position in winner account before liquidating the winner account position for a profit.  With these tactics, O'Brien netted $5,458 in 37 seconds.



**Company SLAB September 29, 2016**
**9:44:40 AM - 9:45:30 AM**

| Source | Account | Role | Shares | Dollars Invested | Profit Realized |
|---|---|---|---|---|---|
| BROKER-DEALER B | ****0697 | HELPER | 720 | $41,355 | -$133 |
| BROKER-DEALER C | ****3322 | WINNER | 8,100 | $462,299 | $5,591 |
| | | TOTAL | 8,820 | $503,655 | $5,458 |

Note: The total shares traded by the accounts listed above during the event (purchases and sales) was 17,640. This activity made up 84.2% of the 20,957 shares traded in the market from 9:44:50 AM through 9:45:20 AM (the range of time from the first event trade to the last event trade).

## Company SLAB September 29, 2016
### 9:44 AM - 9:45 AM

| ID | Source | Account | Role | Order Time | Execution Time | Cancel Time | Buy/ Sell | Order Type | Order Quantity | Execution Quantity | Share Balance | Order Price | Execution Price | Best Bid | Best Ask |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BROKER-DEALER B | ****0697 | Helper | 9:44:44 | | 9:44:47 | Sell | Limit | 100 | 0 | 0 | $57.55 | | | |
| 2 | BROKER-DEALER B | ****0697 | Helper | 9:44:48 | | 9:45:05 | Sell | Limit | 100 | 0 | 0 | $57.39 | | | |
| 3 | BROKER-DEALER B | ****0697 | Helper | 9:44:51 | 9:44:51 | | Sell | Limit | 100 | 100 | 0 | $57.19 | $57.19 | $56.95 | $57.39 |
| 4 | BROKER-DEALER B | ****0697 | Helper | 9:44:51 | | 9:45:05 | Sell | Limit | 100 | 0 | (100) | $57.19 | | | |
| 5 | BROKER-DEALER B | ****0697 | Helper | 9:44:52 | | 9:45:05 | Sell | Limit | 100 | 0 | (100) | $57.19 | | | |
| 6 | BROKER-DEALER C | ****3322 | Winner | 9:44:54 | 9:44:54 | | Buy | Market | 2,700 | 2,700 | 2,700 | | $57.11 | $56.58 | $57.17 |
| 7 | BROKER-DEALER B | ****0697 | Helper | 9:44:57 | 9:44:58 | | Sell | Limit | 100 | 100 | (200) | $57.01 | $57.01 | $56.63 | $57.01 |
| 8 | BROKER-DEALER B | ****0697 | Helper | 9:44:57 | 9:44:58 | | Sell | Limit | 100 | 100 | (300) | $57.01 | $57.01 | $56.63 | $57.01 |
| 9 | BROKER-DEALER C | ****3322 | Winner | 9:44:59 | 9:44:59 | | Buy | Market | 2,700 | 2,700 | 5,400 | | $57.10 | $56.71 | $57.19 |
| 10 | BROKER-DEALER B | ****0697 | Helper | 9:45:02 | 9:45:03 | | Sell | Limit | 100 | 100 | (400) | $57.01 | $57.01 | $56.69 | $57.01 |
| 11 | BROKER-DEALER C | ****3322 | Winner | 9:45:04 | 9:45:04 | | Buy | Market | 2,700 | 2,700 | 8,100 | | $57.01 | $56.74 | $57.19 |
| 12 | BROKER-DEALER B | ****0697 | Helper | 9:45:07 | 9:45:07 | | Buy | Market | 300 | 300 | (100) | | $57.20 | $56.74 | $57.19 |
| 13 | BROKER-DEALER B | ****0697 | Helper | 9:45:08 | 9:45:08 | | Sell | Limit | 100 | 0 | 0 | $57.38 | $57.38 | $56.87 | $57.55 |
| 14 | BROKER-DEALER B | ****0697 | Helper | 9:45:08 | | 9:45:19 | Buy | Limit | 100 | 0 | 0 | $57.38 | | | |
| 15 | BROKER-DEALER B | ****0697 | Helper | 9:45:09 | | 9:45:19 | Buy | Limit | 100 | 0 | 0 | $57.38 | | | |
| 16 | BROKER-DEALER B | ****0697 | Helper | 9:45:09 | | 9:45:19 | Buy | Limit | 100 | 0 | 0 | $57.38 | | | |
| 17 | BROKER-DEALER B | ****0697 | Helper | 9:45:09 | | 9:45:19 | Buy | Limit | 100 | 0 | 0 | $57.38 | | | |
| 18 | BROKER-DEALER B | ****0697 | Helper | 9:45:10 | 9:45:10 | | Buy | Limit | 100 | 100 | 100 | $57.76 | $57.75 | $57.38 | $57.76 |
| 19 | BROKER-DEALER B | ****0697 | Helper | 9:45:12 | 9:45:12 | | Buy | Limit | 100 | 100 | 200 | $57.65 | $57.65 | $57.38 | $57.76 |
| 20 | BROKER-DEALER B | ****0697 | Helper | 9:45:12 | | 9:45:19 | Buy | Limit | 100 | 0 | 200 | $57.65 | | | |
| 21 | BROKER-DEALER B | ****0697 | Helper | 9:45:12 | | 9:45:19 | Buy | Limit | 100 | 0 | 200 | $57.65 | | | |
| 22 | BROKER-DEALER C | ****3322 | Winner | 9:45:14 | 9:45:14 | | Sell | Market | 2,700 | 2,700 | 5,400 | | $57.76 | $57.65 | $57.93 |
| 23 | BROKER-DEALER C | ****3322 | Winner | 9:45:15 | 9:45:15 | | Sell | Market | 2,700 | 2,700 | 2,700 | | $57.76 | $57.65 | $57.93 |
| 24 | BROKER-DEALER B | ****0697 | Helper | 9:45:12 | 9:45:15 | | Buy | Limit | 100 | 100 | 300 | $57.65 | $57.65 | $57.65 | $57.93 |
| 25 | BROKER-DEALER B | ****0697 | Helper | 9:45:12 | 9:45:15 | 9:45:19 | Buy | Limit | 100 | 20 | 320 | $57.65 | $57.65 | $57.65 | $57.93 |
| 26 | BROKER-DEALER C | ****3322 | Winner | 9:45:18 | 9:45:18 | | Sell | Market | 2,700 | 2,700 | 0 | | $57.76 | $57.65 | $57.93 |
| 27 | BROKER-DEALER B | ****0697 | Helper | 9:45:20 | | 9:45:20 | Buy | Limit | 320 | 0 | 320 | $57.60 | | | |
| 28 | BROKER-DEALER B | ****0697 | Helper | 9:45:20 | 9:45:20 | 9:45:22 | Sell | Limit | 320 | 200 | 120 | $57.60 | $57.60 | $57.60 | $57.93 |
| 29 | BROKER-DEALER B | ****0697 | Helper | 9:45:20 | | 9:45:20 | Sell | Limit | 120 | 0 | 120 | $57.60 | | | |
| 30 | BROKER-DEALER B | ****0697 | Helper | 9:45:21 | 9:45:21 | | Sell | Limit | 120 | 120 | 0 | $57.31 | $57.34 | $57.31 | $57.80 |

Notes: If an order was filled through multiple transactions, then the execution time is the time of the last transaction. Highlighted rows indicate winner account activity. The best ask and best bid are as of the order time.

## APPENDIX B

## Example of One of O'Brien's Coordinated Trading Events on April 2, 2019

On April 2, 2019, O'Brien conducted 12 coordinated trading events in 12 different stocks, one of which was Shopify Inc. ("SHOP"), which is traded on the NYSE.  In one 122-second period, from roughly 10:04:27 AM to 10:06:29 AM, two of the Coordinated Accounts traded, netting profits across both accounts of approximately $4,617.  During that time period, these trades constituted roughly 37% of the SHOP shares traded in the market.  This 122-second period of trading illustrates O'Brien's coordinated trading activity:

1. **Helper account sells (driving down price of security):**  The event begins with five short sell limit orders in the Broker-Dealer F helper account in SHOP for 100 shares, entered between 10:04:27 and 10:04:56 for prices between $199.53 and $199.91.  Out of five orders, 403 shares are executed.  This account is acting as a helper account to push the price of SHOP down before and while the winner account begins accumulating.

2. **Winner account buys (accumulating position in security):**  While the helper account is selling, O'Brien placed and executed two market orders to purchase a total of 5,700 shares of SHOP in the winner account held at Broker-Dealer J.  The orders were executed at 10:04:43 and 10:04:58 for an average of $199.64 per share.

3. **Helper account buys (increasing price of security):**  Once the winner account accumulated its 5,700 share position, the helper account at Broker-Dealer F starts buying.  The helper account begins with a buy limit order for 403 shares at $200.01 to close out the small short position it acquired in step 1 (this order executes well below the limit price at $199.48).  The helper account follows this order with 5 additional limit orders for 100 shares between 10:05:41 and 10:06:25 priced between $200.12 and $200.43 per share.  These orders are to create or enhance a price spike following the buys in the winner account seconds earlier.  Three of the five buy limit orders were executed in full at prices ranging from $200.27 to $200.43.  During the time when these buy limit orders were entered to when the last was executed, the NBBO moved from $199.22 - $199.48 to $$200.28 - $200.50.  The remaining shares of the 2 buy limit orders were cancelled after the winner account liquidated its position.

4. **Winner account sells (liquidating position in security):**  As the Broker-Dealer F account was helping to increase the price of SHOP, the Broker-Dealer J winner account quickly entered three market sell orders for 1,900 shares, executing all 5,700 shares at an average of $200.41 per share between 10:05:45 and 10:06:26, netting $4,384.

5. **Helper account closes position**:  The coordinated trading event came to a close when the Broker-Dealer F helper account closed its small acquired position of 300 shares of SHOP with a sell limit order at 10:06:29 for a small profit of $233.

Thus, O'Brien used the helper account to push the price of SHOP down before and while acquiring the larger position in the winner account and then used the helper account to push the

price of SHOP up after acquiring the position in winner account.  With these tactics, O'Brien netted $4,617 in 122 seconds.



**Company SHOP April 2, 2019**
**10:04:20 AM - 10:06:40 AM**

| Source | Account | Role | Shares | Dollars Invested | Profit Realized |
|--------|---------|------|--------|------------------|-----------------|
| BROKER-DEALER F | ****6446 | HELPER | 703 | $140,485 | $233 |
| BROKER-DEALER J | ****3526 | WINNER | 5,700 | $1,137,964 | $4,384 |
| | | TOTAL | 6,403 | $1,278,449 | $4,617 |

Note: The total shares traded by the accounts listed above during the event (purchases and sales) was 12,806. This activity made up 37.5% of the 17,731 shares traded in the market from 10:04:27 AM through 10:06:29 AM (the range of time from the first event trade to the last event trade).

**Company SHOP April 2, 2019**
**10:04 AM - 10:06 AM**

| ID | Source | Account | Role | Order Time | Execution Time | Cancel Time | Buy/ Sell | Order Type | Order Quantity | Execution Quantity | Share Balance | Order Price | Execution Price | Best Bid | Best Ask |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | BROKER-DEALER F | ****6446 | Helper | 10:04:27 | 10:04:27 | | Sell | Limit | 100 | 100 | (100) | $199.85 | $199.85 | $199.81 | $199.91 |
| 2 | BROKER-DEALER F | ****6446 | Helper | 10:04:24 | 10:04:28 | 10:04:56 | Sell | Limit | 100 | 3 | (103) | $199.91 | $199.91 | $199.81 | $199.91 |
| 3 | BROKER-DEALER F | ****6446 | Helper | 10:04:30 | 10:04:30 | | Sell | Limit | 100 | 100 | (203) | $199.73 | $199.84 | $199.82 | $200.08 |
| 4 | BROKER-DEALER J | ****3526 | Winner | 10:04:43 | 10:04:43 | | Buy | Market | 3,800 | 3,800 | 3,800 | | $199.64 | $199.35 | $199.59 |
| 5 | BROKER-DEALER F | ****6446 | Helper | 10:04:34 | 10:04:46 | | Sell | Limit | 100 | 100 | (303) | $199.74 | $199.59 | $199.34 | $199.59 |
| 6 | BROKER-DEALER F | ****6446 | Helper | 10:04:56 | 10:04:56 | | Sell | Limit | 100 | 100 | (403) | $199.53 | $199.53 | $199.50 | $199.74 |
| 7 | BROKER-DEALER J | ****3526 | Winner | 10:04:58 | 10:04:58 | | Buy | Market | 1,900 | 1,900 | 5,700 | | $199.65 | $199.47 | $199.76 |
| 8 | BROKER-DEALER F | ****6446 | Helper | 10:05:02 | 10:05:02 | | Buy | Limit | 403 | 403 | 0 | $200.01 | $199.46 | $199.22 | $199.48 |
| 9 | BROKER-DEALER F | ****6446 | Helper | 10:05:41 | | 10:06:30 | Buy | Limit | 100 | | 0 | $200.12 | | | |
| 10 | BROKER-DEALER J | ****3526 | Winner | 10:05:45 | 10:05:45 | | Sell | Market | 1,900 | 1,900 | 3,800 | | $200.23 | $200.18 | $200.32 |
| 11 | BROKER-DEALER F | ****6446 | Helper | 10:05:57 | 10:05:58 | | Buy | Limit | 100 | 100 | 100 | $200.27 | $200.27 | $200.27 | $200.35 |
| 12 | BROKER-DEALER J | ****3526 | Winner | 10:06:00 | 10:06:00 | | Sell | Market | 1,900 | 1,900 | 1,900 | | $200.24 | $200.18 | $200.33 |
| 13 | BROKER-DEALER F | ****6446 | Helper | 10:06:12 | 10:06:12 | | Buy | Limit | 100 | 100 | 200 | $200.33 | $200.33 | $200.26 | $200.39 |
| 14 | BROKER-DEALER F | ****6446 | Helper | 10:06:17 | 10:06:20 | | Buy | Limit | 100 | 100 | 300 | $200.43 | $200.43 | $200.28 | $200.50 |
| 15 | BROKER-DEALER F | ****6446 | Helper | 10:06:25 | | 10:06:31 | Buy | Limit | 100 | | 300 | $200.35 | | | |
| 16 | BROKER-DEALER J | ****3526 | Winner | 10:06:26 | 10:06:26 | | Sell | Market | 1,900 | 1,900 | 0 | | $200.77 | $200.60 | $200.85 |
| 17 | BROKER-DEALER F | ****6446 | Helper | 10:06:29 | 10:06:29 | | Sell | Limit | 300 | 300 | 0 | $200.51 | $200.79 | $200.59 | $200.85 |

Notes: If an order was filled through multiple transactions, then the execution time is the time of the last transaction. Highlighted rows indicate winner account activity. The best ask and best bid are as of the order time.