UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                       Plaintiff,

    -against-

JAMES DAVID O'BRIEN,

                       Defendant.

21-cv-9575 (DLC)

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR MONETARY RELIEF

Bennett Ellenbogen (elenbogenb@sec.gov)
Paul G. Gizzi (gizzip@sec.gov)
Chevon N. Walker (walkerch@sec.gov)
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004
(212) 336-1100

March 17, 2023

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

BACKGROUND ........................................................................................................................ 2

    A.   Allegations in the Complaint Accepted As and Deemed True ........................... 3

    B.   O'Brien's Net Profits from Coordinated Trading Events ..................................... 5

ARGUMENT .............................................................................................................................. 6

    A.   The Court Should Order O'Brien to Disgorge His Net Profits ........................... 7

    B.   The Court Should Order the Disgorged Funds Sent to the U.S. Treasury ..................... 8

    C.   The Court Should Order Prejudgment Interest ............................................... 11

    D.   The Court Should Impose Third Tier Civil Monetary Penalties ..................... 12

CONCLUSION ....................................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

*Bartenwerfer v. Buckley*, 2023 WL 2144417 (S. Ct. 2023)............................................................10

*Chicago v. Envt'l Def. Fund*, 511 U.S. 328 (1994) ......................................................................10

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017) ..........................................................................................7

*Liu v. SEC*, 140 S. Ct. 1936 (2020).......................................................................................passim

*SEC v. deMaison*, 2021 WL 5936385 (2d Cir. 2021).....................................................................7

*SEC v. Elliott*, No. 09-cv-7594 (RJH), 2011 WL 3586454 (S.D.N.Y. Aug. 11, 2011).................15

*SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ....................................................7, 11

*SEC v. Fowler*, 6 F.4th 255 (2d Cir. 2021)..................................................................................6, 7

*SEC v. Haligiannis,* 470 F. Supp. 2d 373 (S.D.N.Y. 2007).....................................................13, 14

*SEC v. Keener*, No. 20-cv-21294 (BB), 2022 WL 17484383 (S.D. Fla. Dec. 7, 2022) ................11

*SEC v. Kon*, No. 21-cv-24320 (RKA), 2022 WL 17583635 (S.D. Fla. Aug. 22, 2022)................10

*SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d. 49 (S.D.N.Y. 2017) .........................................................6

*SEC v. Lek Sec. Corp.*,
    No. 17-cv-1789 (DLC), 2020 WL 1316911 (S.D.N.Y. Mar. 20, 2020) ........................13, 14, 15

*SEC v. Lorin, 877,* F. Supp. 192 (S.D.N.Y. 1995)...........................................................................6

*SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013).............................................13

*SEC v. Rabinovich & Assocs., LP*,
    No. 07-cv-10547 (GEL), 2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008) ................................13

*SEC v. Razmilovic*, 738 F.3d 14 (2d Cir. 2013).......................................................................11, 13

*SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964 (S.D.N.Y. 1973).....................................................6

*SEC v. Shehyn*, No. 04-cv-2003 (LAP), 2010 WL 3290977 (S.D.N.Y. Aug. 9, 2010).................14

*SEC v. Spartan Sec. Gr., Ltd.*,
    No. 19-cv-448 (VMC), 2022 WL 3224008 (M.D. Fla. Aug. 10, 2022) ............................10, 11

*SEC v. Stubos*, __ F. Supp. 3d __, 2022 WL 6776741 (S.D.N.Y. 2022)..........................................7

*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998).................................................................................11

**Statutes and Rules**

Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a)............................................5, 6, 7

Section 20(d) of the Securities Act of 1933, 15 U.S.C. § 77t(d) ................................................5, 12

Section 9(a)(2) of the Securities Exchange Act of 1934, 15 U.S.C. § 78i(a)(2).........................5, 6

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ............................5, 6, 7

Section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)......................... passim

26 U.S.C. § 6621(a)(2)..................................................................................................................11

28 U.S.C. § 2462...........................................................................................................................7

Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701......................................................12

National Defense Authorization Act for Fiscal Year 2021,
    P.L. 116-283 (enacted Jan. 1, 2021)....................................................................................7, 11

Rule 10b-5 under the Securities Exchange Act of 1934, 17 C.F.R. § 240.10b-5 ........................5, 6

Adjustments to Civil Monetary Penalty Amounts,
    Release Nos. 33-11143, 34-96605, dated Jan. 6, 2023 (Effective Jan. 15, 2023) ....................12

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") respectfully submits this memorandum of law in support of its Motion for Monetary Relief ("Motion") as to Defendant James David O'Brien ("O'Brien").

## PRELIMINARY STATEMENT

The Commission brought this enforcement action against O'Brien because he engaged in manipulative, coordinated trading on more than 18,000 occasions during a five-year period. O'Brien's coordinated trading involved trading the same issuer on both sides, nearly simultaneously in multiple accounts maintained in his or his wife's name at different brokerage firms. By artificially decreasing or increasing the prices of securities and then buying or selling the securities in larger quantities, O'Brien made millions of dollars in these trades during the relevant time.[1]

On February 3, 2023, the Court entered a bifurcated judgment, on consent, as to O'Brien. The judgment ordered an injunction against future violations of the securities laws, and provided that the Court would decide the Commission's claims for monetary relief on motion by the Commission. Under the consent judgment, in connection with this Motion, O'Brien is precluded from arguing he did not violate the securities laws, and the allegations in the complaint are to be accepted as and deemed true by the Court, except with respect to the quantum of disgorgement: O'Brien's net profits.

In light of O'Brien's egregious misconduct, as stated in the complaint, substantial monetary relief is warranted against him. The Commission requests that the Court order O'Brien to pay disgorgement of $5,243,399, plus prejudgment interest of $370,547.59. The Commission

---

[1] The Commission's complaint alleged that O'Brien engaged in manipulative trading from September 2015 through at least October 2020 (see, e.g., Compl. ¶ 5) and summarized O'Brien's coordinated trading events and profits during that period (see id. at ¶¶ 16, 35, 43). The Commission's expert's post-discovery analyses identified an expanded period of O'Brien's coordinated trading from December 2015 through May 2021.

also requests that the Court impose a civil penalty of $2,000,000.  The Commission submits with this Motion a proposed Final Judgment as to O'Brien for the Court's consideration.

## BACKGROUND

The Commission filed the complaint on November 18, 2021.  (ECF No. 1, Compl.)  Following discovery, the Commission and O'Brien each moved for summary judgment.  (ECF Nos. 44-62.)  On January 6, 2023, the Court issued an Order denying the parties' cross-motions for summary judgment (ECF No. 63), and issued a separate Order scheduling a jury trial for March 13, 2023 and ordering the parties to contact Magistrate Judge Stewart D. Aaron to conduct a settlement conference (ECF No. 64).

On February 3, 2023, the Commission and O'Brien reached a partial settlement to resolve the non-monetary, injunctive relief the Commission sought in the case, and leaving open for later resolution by motion (or further settlement) the monetary relief sought.  (ECF No. 69.)  The Court entered a consent judgment as to O'Brien on the same day (ECF No. 71, Judgment as to James David O'Brien; ECF No. 73, Consent of Defendant James David O'Brien), and entered an Order setting a briefing schedule on this Motion (ECF No. 70).

The consent judgment provides, among other things, that in connection with this Motion, "Defendant will be precluded from arguing that Defendant did not violate the federal securities laws as alleged in the Complaint," and "for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court except with respect to the quantum of disgorgement, *i.e.,* net profits."  (ECF No. 71, Judgment as to James David O'Brien ¶ IV(a), (c).)  Accordingly, for this Motion, O'Brien may not argue he did not violate the securities laws, and the Court, in deciding whether to order monetary relief, should accept as true the allegations in the complaint other than as to the "quantum of disgorgement."  In addition, the Court entered

the parties' Stipulation In Connection With Defendant's Consent to Judgment (ECF No. 72), which, among other things, provided that, for purposes of this Motion, the complaint's headings shall not be construed as allegations and the Commission would not object to O'Brien testifying subject to cross-examination by the Commission.

    *A.  Allegations in the Complaint Accepted As and Deemed True*

As alleged in the complaint, from at least September 2015 to at least October 2020, Defendant O'Brien engaged in a fraudulent multi-million dollar market manipulation scheme through coordinated trading between multiple accounts maintained in his or his wife's name at different brokerage firms.  (*See* Compl. ¶ 1.)  During this period, O'Brien carried out around 18,000 "coordinated trading events" in eighteen accounts at fourteen different brokerage firms.[2] *See id.* ¶ 16.  The design and intent of O'Brien's scheme was to create the false appearance of trading interest and activity in particular stocks to enable him to purchase stocks at artificially low prices and then quickly sell them at artificially high prices.  *See id.* ¶¶ 1, 18-21, 29.

O'Brien, age 50 when the complaint was filed (now 52), is a resident of Gibbsboro, New Jersey.  *See id.* ¶ 15.  Since 2013, O'Brien has generally described himself on brokerage account opening documents as a trader or as self-employed.  *See id.*  O'Brien was previously employed at a number of brokerage firms beginning in 1994, most recently at a registered brokerage firm

---

[2] The complaint defines "coordinated trading event" as follows:
- Two or more accounts trade and hold positions in the same exchange traded stock, on the same day, and during the same time;
- The event starts when the first account trades and ends when all of the involved accounts close out their positions (or when the trading day ends);
- At least one of the accounts behaves as a winner account—an account that has an average transaction size greater than or equal to 1,000 shares; and
- At least one of the involved accounts behaves as a helper account—an account that has an average transaction size of fewer than 500 shares and is held at a different brokerage firm than the winner account.

(Compl. ¶ 17.)  The Commission's expert witness used a slightly modified definition in analyzing O'Brien's trading, with minor modifications that made the definition slightly more conservative.  *See infra.*

from 2006 until his employment was terminated in 2013. *See id.* O'Brien formerly held Series 7, 10, 55, and 63 licenses. *See id.*[3]

As alleged in the complaint, O'Brien simultaneously traded stocks in two or more accounts at separate brokerage firms in a coordinated manner. *See id.* ¶¶ 2, 17-25. O'Brien generally accumulated larger stock positions in one or more accounts at one brokerage firm (the "winner" accounts), and placed smaller orders in the same securities on the opposite side of the market in one or more accounts at a different brokerage firm (the "helper" accounts). *See id.*

O'Brien used helper account trades (i) to decrease the price of the security *before* he acquired it in the winner accounts, and/or (ii) to increase the price of the security *after* he acquired it in the winner accounts. *See id.* ¶¶ 3, 19-28. O'Brien then sold the securities in the winner accounts, seeking to generate a net profit across all of the involved accounts. *See id.*

Through this repetitive trading activity, O'Brien engaged in a manipulative trading scheme with the intent to induce other market participants to fill his orders at artificially inflated or deflated prices. *See id.* ¶¶ 4, 29-30.

As alleged in the complaint, between September 17, 2015 and October 29, 2020, O'Brien executed about 18,000 coordinated trading events, with around seventy-five percent of these coordinated trading events resulting in net profits across the involved accounts. *See id.* ¶¶ 5, 16, 31.

O'Brien obtained millions in profits from his coordinated trading events, and his trading involved over $10.4 billion dollars used to purchase the more than 2,119 stocks with more than 297 billion shares traded. *See id.* ¶¶ 6, 31-32.

---

[3] The complaint specified that O'Brien also held a series 9 license, but the Commission has since learned that he did not, in fact, hold that license.

Brokerage firms repeatedly raised concerns about O'Brien's trading and closed his accounts, but he simply opened accounts at different brokerage firms and carried on the same conduct. *See id.* ¶¶ 7, 49-85. O'Brien also sought to mislead certain of the brokerage firms and/or concealed from them his trading in the same securities in other accounts. *See id.* Even after the Commission began investigating him, and filed an action to enforce an investigative testimony subpoena, O'Brien continued to engage in the same trading activity. *See id.* ¶¶ 7, 86-95.

As a result of his coordinated trading, O'Brien violated the antifraud and anti-manipulation provisions of the securities laws: Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77q(a)(1) and (3), and Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78i(a)(2) and 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and (c). (*See* Compl. ¶¶ 8, 96-104.)

The Commission sought relief in the form of an injunction against future violations of the securities laws, disgorgement of ill-gotten gains plus prejudgment interest, and civil monetary penalties pursuant to Securities Act Section 20(d), 15 U.S.C. § 77t(d), and the Exchange Act Section 21(d)(3), 15 U.S.C. § 78u(d)(3). (Compl. Prayer for Relief ¶¶ I-IV.)

B. *O'Brien's Net Profits from Coordinated Trading Events*

As set forth in the accompanying Declaration of Evgeny (Eugene) Orlov, Ph. D. ("Orlov. Decl."), which follows his two expert reports provided during this litigation, between at least December 2015 and May 2021, O'Brien carried out more than 19,000 "Coordinated Trading Events" involving more than 2,200 stocks in 24 accounts at 18 different brokerage firms. (Orlov

Decl. ¶¶ 7-8.)[4] Specifically, O'Brien executed a total of 19,314 Coordinated Trading Events, of which 14,275 were profitable, while the remainder were unprofitable. (Orlov Decl. ¶ 10.) O'Brien's net ill-gotten gains from all Coordinated Trading Events was $5,243,399. (Orlov Decl. ¶ 14.)[5]

## ARGUMENT

Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5 prohibit fraud in the offer, purchase, or sale of securities. 15 U.S.C. §§ 77q(a) and 78j(b); 17 C.F.R. § 240.10b-5. Exchange Act Section 9(a)(2) makes it unlawful to effect, alone or with one or more other persons (1) a series of securities transactions, (2) that raise or depress price, or create actual or apparent volume, (3) for the purpose of inducing others to buy or sell. 15 U.S.C. § 78i(a)(2). Manipulative activities of the type prohibited by Exchange Act Section 9(a)(2) are also violations of Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5. *See, e.g., SEC v. Lorin, 877,* F. Supp. 192, 200 (S.D.N.Y. 1995)*; SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964, 975 (S.D.N.Y. 1973). *See also SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d. 49, 60, 62 (S.D.N.Y. 2017) (finding on motion to dismiss that layering violated both Exchange Act Sections 9(a)(2) and 10(b) and Rule 10b-5). As described above, O'Brien engaged in manipulative securities trading from at least late 2015 to at least May 2021. The Court should order the requested monetary relief as to O'Brien.[6]

---

[4] The Commission requests that the Court order disgorgement based on O'Brien's coordinated trading net profits as identified during the period Dr. Orlov analyzed as provided during the litigation in his Expert Report and Amended Expert Report.

[5] Between December 2015 and May 2021, O'Brien earned $10,427,669 on his profitable Coordinated Trading Events, incurred losses of $4,315,912 on his unprofitable Coordinated Trading Events, and paid approximately $868,358 in brokerage commissions and SEC fees, netting to $5,243,399. (Orlov Decl. ¶¶ 10, 12-14.)

[6] As noted above, O'Brien agreed to tolling of the statute of limitations, such that none of his trading at issue subject to disgorgement in this Motion is barred under either a five-year or ten-year statute of limitations. *See SEC v.*

*A. The Court Should Order O'Brien to Disgorge His Net Profits.*

A district court has broad equitable powers to order appropriate remedies, including ordering defendants to disgorge their ill-gotten gains, where it has found securities law violations. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474–76 (2d Cir. 1996). Disgorgement is permissible equitable relief under Exchange Act Section 21(d)(5), 15 U.S.C. § 78u(d)(5), which authorizes the Commission to seek, and district courts to order, "any equitable relief that may be appropriate or necessary for the benefit of investors." *See Liu v. SEC*, 140 S. Ct. 1936 (2020). It is also permissible under Exchange Act Section 21(d)(7): "In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement." 15 U.S.C. § 78u(d)(7); *see also* Exchange Act Section 21(d)(3), 15 U.S.C. § 78u(d)(3).[7] Ordering O'Brien to pay disgorgement of $5,243,399 is appropriate under both provisions.

The Commission need only show a "reasonable approximation" of the amount of a defendant's ill-gotten gains. *SEC v. Fowler*, 6 F.4th 255, 267 (2d Cir. 2021); *SEC v. deMaison*, 2021 WL 5936385, at *2 (2d Cir. 2021). So long as the measure of disgorgement is reasonable, "any risk of uncertainty about the amount falls on the wrongdoer whose illegal conduct created that uncertainty." *Fowler*, 6 F.4th at 267 (internal quotation marks and editing omitted).

---

*Fowler*, 6 F.4th 255, 260-62 (2d Cir. 2021) (discussing tolling). In *Kokesh v. SEC*, 137 S. Ct. 1635, 1642 (2017), the Supreme Court ruled that Commission requests for disgorgement constitute a "penalty" subject to the five-year statute of limitations in 28 U.S.C. § 2462. Section 6501 of the National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), P.L. 116-283, § 6501 (116th) (enacted Jan. 1, 2021), amended Exchange Act Section 21(d)(8), 15 U.SC. § 78u(d)(8), to extend the statute of limitations to ten years for scienter based violations, including Securities Act Section 17(a)(1) and Exchange Act Section 10(b). Because O'Brien's violations were scienter-based, the Court can order disgorgement of his profits going back 10 years, regardless of tolling. *See SEC v. Stubos*, __ F. Supp. 3d __, 2022 WL 6776741, at *11-15 (S.D.N.Y. 2022).

[7] Section 21(d)(7) was added to the Exchange Act by Section 6501(a) of the NDAA. Section 6501(b) of the 2021 NDAA provides that the relevant provisions of the NDAA apply "to any action or proceeding that is pending on, or commenced on or after, the date of" the NDAA's enactment (Jan. 1, 2021). This action was filed in November 2021.

7

As described above, the bifurcated consent judgment as to O'Brien (ECF No. 71) provides that, on this Motion, all allegations in the complaint are deemed true, except with regard to the quantum of disgorgement: O'Brien's "net profits."

As set forth in the complaint and described above, O'Brien for more than five-years consistently engaged in manipulative coordinated trading. His thousands of coordinated trading events were in violation of the antifraud and anti-manipulation provisions of the securities laws. He should be made to disgorge his ill-gotten gains derived from those violations.

The Commission seeks disgorgement of $5,243,399, which represents a conservative, reasonable approximation of O'Brien's "net profits" from his manipulative trading scheme. The Commission calculated O'Brien's net profits for the period from December 2015 through May 2021, as set forth in the Orlov Declaration. (Orlov Decl. ¶¶ 10, 12-14.) Given the nature of O'Brien's manipulative trading scheme, in which arguably "the 'entire profit of [his] business or undertaking' results from the wrongful activity," this calculation represents a conservative calculation of O'Brien's net profits that is authorized by *Liu v. SEC*. *Liu*, 140 S. Ct. at 1945, 1950.

### B. The Court Should Order the Disgorged Funds Sent to the U.S. Treasury.

The Commission requests that the disgorged funds be sent to the U.S. Treasury, and the proposed Final Judgment includes a finding that this aligns with equitable principles. This result is appropriate under Exchange Act Section 21(d)(5), 15 U.S.C. 78u(d)(5), the provision construed in *Liu*, and Exchange Act Section 21(d)(7), 15 U.S.C. 78u(d)(7), a post-*Liu* amendment to the Exchange Act.

Disgorgement is ordered to reflect the "foundational principle" that "it would be inequitable that a wrongdoer should make a profit out of his own wrong." *Liu*, 140 S. Ct. at

1943. *Liu* criticized the practice of distributing disgorged funds to the Treasury "*instead of*" to "known victims." 140 S. Ct. at 1946, 1948 (emphasis added). But where distribution to investors is infeasible, *Liu* left as "an open question whether, and to what extent," distribution to the Treasury is "consistent with equitable principles" as well as with the "limitations" of Section 21(d)(5). 140 S. Ct. at 1948-49.

While the Commission endeavors to distribute disgorged funds to harmed investors when that is feasible, such a distribution is not feasible in this case. O'Brien's conduct caused serious harm to the capital markets, but identifying specific investors who were harmed and the amount by which any particular investor was harmed would be an enormously difficult and costly task and would not be feasible in this case. The harmed investors were those who purchased or sold securities at artificially inflated or depressed prices during O'Brien's more than 19,000 separate Coordinated Trading Events. Given the often very short periods of time when O'Brien inflated or depressed a particular stock price through manipulative conduct, in many instances less than one minute, it would be enormously difficult, and not necessarily possible, to identify harmed investors who executed trades during the exact time period for each of the 19,000 Coordinated Trading Events, which involved 2,248 separate stocks. The costs of identifying such harmed investors, which may number in the hundreds or thousands for each of the 19,000 Coordinated Trading Events, along with the costs for processing claims, calculating of distribution amounts, and issuing checks could easily exceed the amount of disgorgement. Moreover, even if there were no issues with identifying investors or distribution costs involved, the median profit per event was $358 as set forth in Dr. Orlov's Amended Expert Report, which would result in extremely small distribution payments.

Because distribution to harmed investors is not feasible, the only alternative that is

9

consistent with equitable principles is to send the disgorged funds to the Treasury. O'Brien's conduct caused considerable damage to the market and investors over a period of more than five years and allowing O'Brien to retain the funds would be inequitable. In circumstances like this, courts have properly recognized that "[b]etween the money staying with [the violator] or a fund at the Treasury, it is more equitable to order disgorgement." *SEC v. Spartan Sec. Gr., Ltd.*, No. 19-cv-448 (VMC), 2022 WL 3224008, at *9-10 (M.D. Fla. Aug. 10, 2022); *see also SEC v. Kon*, No. 21-cv-24320 (RKA), 2022 WL 17583635, at *4 (S.D. Fla. Aug. 22, 2022) (report and recommendation; following *Spartan*). Distribution to the Treasury serves the "foundational" principle of equity that no person should profit from his own wrong. *Liu*, 140 S. Ct. at 1943, 1948. It is also "appropriate or necessary for the benefit of investors" because the only other result—allowing O'Brien to retain money to which he never had a legitimate claim—would reward and thus incentivize conduct that the securities laws prohibit to protect investors.

Post-*Liu* amendments to the Exchange Act give this Court additional flexibility to disburse collected funds to the Treasury. *Liu* reasoned that distribution to the Treasury instead of to victims would "render meaningless" Exchange Act Section 21(d)(5)'s "require[ment]" that relief be ordered "for the benefit of investors"—a phrase that the Court construed as a "limitation[]" or "restrict[ion]" on a court's equitable authority. *Liu*, 140 S. Ct. at 1947-49. But Sections 21(d)(3)(A)(ii) and (d)(7) authorize disgorgement without that restrictive language, and that choice is presumed to be "intentional[] and purpose[ful]," particularly because it occurred within months of *Liu*'s relying on that statutory phrase to restrict courts' equitable authority to disburse funds to the Treasury. *Chicago v. Envt'l Def. Fund*, 511 U.S. 328, 338 (1994); *see Bartenwerfer v. Buckley*, 2023 WL 2144417, at *6-7 (S. Ct. Feb 22, 2023) (same, where Congress removed the "strongest textual hook" for particular construction of a statute).

Accordingly, under these amendments, this Court has the full equitable authority to prevent unjust enrichment by disbursing collected funds to the Treasury. *See Spartan Sec.*, 2022 WL 3224008, at *9 ("The Court holds that it may order disgorgement and direct that disgorged funds be sent to the Treasury under Section 78u(d)(7)."); *SEC v. Keener*, No. 20-cv-21294 (BB), 2022 WL 17484383, at *9 (S.D. Fla. Dec. 7, 2022) (the 2021 NDAA "moots" the Treasury question).

  C. *The Court Should Order Prejudgment Interest.*

The bifurcated consent judgment entered in this action provides that "[i]f disgorgement is ordered, Defendant shall pay prejudgment interest thereon, calculated from June 1, 2021, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)."

Because O'Brien had use of his ill-gotten gains for several years in the past, this Court should also award prejudgment interest. When ordering disgorgement, courts have "discretion to require the defendant to pay prejudgment interest for the period during which he had the use of his unlawful gains." *See SEC v. Razmilovic*, 738 F.3d 14, 35-36 (2d Cir. 2013). Courts have regularly granted prejudgment interest in Commission enforcement actions. *E.g.*, *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998); *First Jersey*, 101 F.3d at 1476. It would not be equitable for O'Brien to obtain an interest-free loan from his illicit profits.

Consistent with the terms of the bifurcated judgment in this action, the Commission calculated prejudgment interest at the IRS underpayment rate from June 1, 2021, until February 3, 2023, the time O'Brien agreed to the bifurcated judgment, on the disgorgement the Commission seeks from O'Brien as $370,547.59. (Declaration of Stephen Johnson ("Johnson Decl.") ¶ 5.) The combined total for disgorgement plus prejudgment interest comes to the

following: $5,613,946.59.  (Johnson Decl. ¶ 6.)  The Court should order O'Brien to pay prejudgment interest in the amount calculated by the Commission.

*D.  The Court Should Impose Third Tier Civil Monetary Penalties.*

In addition to disgorgement with prejudgment interest, the Court should impose third tier penalties as to O'Brien totaling $2,000,000.  Securities Act Section 20(d) and Exchange Act Section 21(d)(3) authorize courts to impose civil penalties to be paid by the person who committed violations of the securities laws.  15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).  The statutes provide that the penalties "shall be determined by the court in light of the facts and circumstances," and provide three tiers of penalties to be imposed for "each violation" of the securities laws.  *Id.*  A first tier penalty may be imposed for any violation; a second tier penalty may be imposed if the violation involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and a third tier penalty may be imposed when the requirements of a second tier penalty are met, and the violation also "resulted in substantial losses or created a significant risk of substantial losses to other persons."  *Id.*  The statutes provide that, for all three tiers, the amount of the penalty that the Court can impose, per violation, "shall not exceed the greater of" the current statutory amount in effect at the time of the violation, or the "gross amount of pecuniary gain to such defendant."  *Id.*

Pursuant to the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, the statutory maximum penalty amounts per violation were adjusted for inflation for violations after February 14, 2005.  The current statutory amount for a third tier penalty for an individual is $223,229.  *See* Adjustments to Civil Monetary Penalty Amounts, Release Nos. 33-11143, 34-96605, dated Jan. 6, 2023 (Effective Jan. 15, 2023) (increasing penalty amounts per violation to $223,229).

12

Aside from the maximum statutory restrictions, the appropriate civil penalty amount is within "the discretion of the district court." *Razmilovic*, 738 F.3d at 38 (citation omitted). Factors that courts consider in determining whether penalties should be imposed, and the amount of the penalty, include (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced because of the defendant's demonstrated current and future financial condition. *SEC v. Haligiannis,* 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007).

There are many ways a court may calculate the number of violations, including counting *each* of O'Brien's more than 19,000 Coordinated Trading Events as separate violations. *See, e.g., SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 287-88 & n.7 (2d Cir. 2013) (ruling that statutory language "to such defendant" precludes imposition of joint and several liability for penalties, but noting that each illegal trade could be viewed as a separate violation) ("Although we vacate the civil penalty award, we find no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation."). The Court could alternatively count each of the months in which O'Brien conducted coordinated trading events, which would number sixty-six here. *See SEC v Lek Sec. Corp.*, No. 17-cv-1789 (DLC), 2020 WL 1316911, at *9 (S.D.N.Y. Mar. 20, 2020) (noting that, in a case involving "millions of transactions . . ., using transactions or even instances of manipulation as a measure would produce a staggering penalty" and that, in such a situation, "[a] penalty measured in terms of months is a reasonable intermediate metric that fulfills the need to impose significant fines while honoring the value of proportionality"). While some courts have counted a manipulative scheme as the only violation, *see, e.g., SEC v. Rabinovich & Assocs., LP*, No. 07-cv-10547

(GEL), 2008 WL 4937360, at *6 (S.D.N.Y, Nov. 18, 2008) (imposing one third tier penalty for scheme involving antifraud, securities registration, and broker registration violations), or counted each statute or rule violated, *see, e.g.*, *SEC v. Shehyn*, No. 04-cv-2003 (LAP), 2010 WL 3290977, at *8 (S.D.N.Y. Aug. 9, 2010) (imposing one third tier penalty for each statute or rule violated), such an approach in this case would result in an unreasonably low penalty in light of the nature and extent of O'Brien's manipulative trading scheme. The Court should impose penalties here that reflect the vast size of the fraudulent scheme and time period in which it continued in order to achieve an appropriate deterrent in this case. The Court could also impose a penalty of up to O'Brien's "gross pecuniary gains" of $10.4 million (*i.e.,* the "gross" amount of profits from his successful Coordinated Trading Events, rather than lesser "net profits").

Third tier civil penalties are appropriate because O'Brien's conduct involved fraud and manipulation, and created the risk of substantial losses to other market participants. *See Lek Sec. Corp.*, 2020 WL 1316911, at *7 (imposing third tier penalties because "[t]he record demonstrates that the Defendants' conduct falls into the third tier of penalties because it involved fraud and created a significant risk of substantial losses to other investors"). Considering the factors identified in *Haligiannis,* significant third tier civil penalties should be imposed on O'Brien. As alleged in the complaint, his conduct includes years spent engaging in unlawful manipulative, coordinated trading. (Compl. ¶ ¶ 5, 16.) His conduct was egregious in that he continued his trading despite warnings from brokers who often closed his accounts. *See id.* ¶¶ 49-85. Indeed, O'Brien continued to engage in his manipulative trading scheme even after the Commission began investigating him. *See id.* ¶¶ 86-95. O'Brien understood his coordinated trading activity repeatedly induced other investors to buy and sell securities at prices that were artificially inflated or deflated, because of O'Brien's manipulative conduct. *See id.* ¶ 1 ("The design and

14

intent of O'Brien's scheme was to create the false appearance of trading interest and activity in particular stocks to enable him to purchase stocks at artificially low prices and then quickly sell them at artificially high prices."). Also, his conduct was recurrent, being repeated on more than 19,000 occasions over five years. (Orlov Decl. ¶¶ 8, 10.) As such, O'Brien acted with a high degree of scienter.

The Commission proposes that the Court impose a penalty of $2 million. This amount is well within the amounts authorized by the statutes. While it is more than a one-time statutory third tier penalty of $223,229, it is significantly less than if the Court were to order a maximum third tier penalty for *each* of O'Brien's more than 19,000 Coordinated Trading Events or each of the sixty-six months in which O'Brien conducted Coordinated Trading Events. It is also less than one-half of O'Brien's net profits of $5.2 million, and less than one-fifth of O'Brien's $10.4 million gross pecuniary gains from his illegal conduct. The Commission submits that it is appropriate for the Court to impose a $2 million civil penalty as to O'Brien.

Finally, the Court should not consider any argument O'Brien may submit concerning his ability to pay a penalty. In early February 2023, the Commission requested that he complete a statement of his financial condition if he raises such an argument, but he has not provided such information. (Declaration of Bennett Ellenbogen ¶¶ 3-4.) *See, e.g., SEC v. Elliott*, No. 09-cv-7594 (RJH), 2011 WL 3586454, at *19 (S.D.N.Y. Aug. 11, 2011) (declining not to order penalties where defendants did not provide any documentation about their financial condition). And if O'Brien submits such evidence on this Motion, the Court should not take it into account. *See SEC v. Lek Sec. Corp.*, 2020 WL 1316911, at *8 (ordering substantial civil penalties despite defendants' providing affidavits showing limited resources; "When weighed against the clear need to assess a substantial civil penalty, Defendants' current financial position is not a bar to the

15

imposition of significant civil penalties.")

## CONCLUSION

For all these reasons, the Commission requests that the Court order the requested monetary relief against Defendant James David O'Brien, and enter on the docket the Commission's proposed Final Judgment.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

Dated: March 17, 2023
New York, NY

/s/ Bennett Ellenbogen
/s/ Paul G. Gizzi
/s/ Chevon N. Walker

_____

Bennett Ellenbogen (ellenbogenb@sec.gov)
Paul G. Gizzi (gizzip@sec.gov)
Chevon N. Walker (walkerch@sec.gov)
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004
(212) 336-1100