**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| **Plaintiff,** | : | **21-cv-9575 (DLC)** |
| **-against-** | : | |
| **JAMES DAVID O'BRIEN,** | : | |
| **Defendant.** | : | |

**DECLARATION OF EVGENY (EUGENE) ORLOV**

I, Evgeny (Eugene) Orlov, pursuant to 28 U.S.C. § 1746 declare as follows:

1. I am over 18 years of age. I am employed as a Financial Economist with the Office of Litigation Economics in the Division of Economic and Risk Analysis of the Securities and Exchange Commission ("SEC" or "Commission") at its Los Angeles Regional Office. In my role as an SEC Financial Economist, I provide financial, economic, and statistical analyses to assist the Commission in its investigations. I submit this Declaration in support of the SEC's Motion for Monetary Relief against Defendant James David O'Brien ("O'Brien").

2. For this litigation, I was asked to evaluate and analyze O'Brien's stock trading activity and examine the incidence of coordinated trading activity across his accounts as alleged in the SEC complaint ("Complaint"). Specifically, I was asked to identify instances of coordinated trading across the accounts, describe trading patterns associated with coordinated trading, and calculate profits associated with coordinated trading. I was also asked to compare these profits with overall profits from O'Brien's stock trading activity.

3. As a result, I drafted the expert report of Evgeny (Eugene) Orlov, Ph.D., dated August 5, 2022 (the "Expert Report"). A copy of my Expert Report is attached hereto as Exhibit 1.

4. In anticipation of preparing my Expert Report, I received and analyzed blotter data from 22 brokerage firms.[1] (Expert Report ¶ 6.) The blotter data was provided in more than 70 Excel files.[2]

5. Subsequently, I was asked to update the analysis in my Expert Report based on additional blotter data from two brokerage firms provided to me after I filed my Expert Report. I was also asked to review and respond to Mr. Michael T. Dorsey's rebuttal expert report dated September 1, 2022 (the "Dorsey Report") submitted on behalf of O'Brien. I also reviewed the deposition transcripts for O'Brien and Brenda O'Brien.[3] As a result, I prepared the amended expert report of Evgeny (Eugene) Orlov, Ph.D., dated September 16, 2022 (the "Amended Expert Report"). A copy of my Amended Expert Report is attached hereto as Exhibit 2.[4]

6. As noted in my Expert Report, for my analysis, I relied on the defined term "Coordinated Trading Event" used in the Complaint with minor variations. (*See* Expert Report ¶ 7 n.8.) The minor variations—explained in Appendix C to my Expert Report—resulted in a slightly more conservative analysis, as compared with the Complaint, for two reasons. First, I limited the analysis to Coordinated Trading Events that concluded on the same day they began (thus excluding potential Coordinated Trading Events that concluded at a later date). Second, I

[1] The data and materials I considered in forming the opinion set forth in my Expert Report are listed in Appendix B to my Expert Report.

[2] I ultimately used data from 19 of the 22 brokerage firms in my analysis because some trade blotter data was produced multiple times (*i.e.*, by more than one brokerage). (Expert Report ¶ 6 n.6.)

[3] As noted in my Amended Expert Report, none of the opinions in my Expert Report changed after my review of the additional materials. (Amended Expert Report ¶ 4.)

[4] The Dorsey Report does not proffer an opinion relating to O'Brien's profits. In fact, as noted in my Amended Expert Report, the Dorsey Report only focuses on two examples of coordinated trading events, and even there, his opinions are inconsistent with empirical evidence. (Amended Expert Report ¶ 5.)

required Coordinated Trading Events to include at least one instance where (i) the direction of transaction(s) in the helper account was in the opposite direction from the immediately following transaction(s) in the winner account, and (ii) the winner account's transaction(s) did not lag the helper account's transactions by more than 30 seconds. These conditions ensure that I only analyzed strategies that are consistent with coordinated trading behavior.[5]

7. In my Expert Report, I determined that, in total, O'Brien executed Coordinated Trading Events in 24 different accounts at 18 brokerage firms, during a period of more than five years, between December 2015 and May 2021.[6] (Expert Report ¶ 7.)

8. During this period, O'Brien executed over 19,000 Coordinated Trading Events involving the purchase of almost 300 million shares across 2,248 different stocks. (Expert Report ¶ 12.) (The data I relied upon for my Expert Report and Amended Expert Report can be made available for the Court's inspection upon request.)

9. As noted in the Amended Expert Report, after I filed my original Expert Report, I received updated blotter data from two brokerage firms that included improved precision for order and execution times. (Amended Expert Report ¶ 4.) I therefore incorporated these blotter data into my analyses and updated the calculations in my original report. (*See* Amended Expert Report, Appendix A.) These updates had a minimal effect on my results, and as such, none of the opinions in my original Expert Report were changed. (Amended Expert Report ¶ 4.)

[5] When defining Coordinated Trading Events, I also included orders that were canceled as well as orders that were executed; this affected the timing but not the identification of the events.

[6] This period is slightly longer than the period discussed in the Complaint—"at least September 2015 to October 2020"—because in preparation of my Expert Report and Amended Expert Report, I analyzed trade blotters that included trade data beyond October 2020. I have also been asked to analyze O'Brien's Coordinated Trading Events made strictly during the period discussed in the Complaint, as discussed below. I also note that O'Brien testified that he made coordinated trades both prior to 2015 and subsequent to 2020. (*See* O'Brien Dep. Tr. at 149-50 (attached hereto as Exhibit 3).)

10. Overall, in my Amended Expert Report, I determined that O'Brien executed a total of 19,314 Coordinated Trading Events between December 2015 to May 2021. (Amended Expert Report at 11, Appendix A, Orlov Report Updated Exhibit 3. James David O'Brien's Coordinated Trading Events, December 2015 – May 2021.) Of this total, 14,275 Coordinated Trading Events were profitable, while the remainder were unprofitable. *Id.* O'Brien earned $10,427,669 on his profitable Coordinated Trading Events, and had losses of $4,315,912 on his unprofitable events. *Id.* Overall, O'Brien earned net gains of $6,111,757 from all of his Coordinated Trading Events. *Id.*[7]

11. I also summarized O'Brien's Coordinated Trading Events by year for 2015 to 2021. (Amended Expert Report at 12, Appendix A, Orlov Report Updated Exhibit 4. James David O'Brien's Coordinated Trading Events, by Year, December 2015 – May 2021.)[8]

12. Separately, I have estimated the commissions O'Brien paid to brokerage firms on his Coordinated Trading Events between December 2015 and May 2021. First, I aggregated commissions corresponding to Coordinated Trading Events across six, out of 18 total, brokerage firms that provided information on trade commissions in their blotter data. The total comes to $162,199. Second, I used blotter data for the same six brokerage firms to estimate the monthly commission rate for each month between December 2015 and May 2021: I divided the total monthly commissions across the six brokerage firms by the number of shares purchased or sold

[7] In my original Expert Report, I had identified 19,308 Coordinated Trading Events and calculated O'Brien's net profit as $6,115,590. (*See* Expert Report Exhibit 3.) The net profit calculations in my Expert Report and Amended Expert Report did not account for trade commissions and fees, which I estimate below.

[8] Because the Complaint has a slightly different timeframe than my analyses in the Expert Report and the Amended Expert Report, I have also prepared versions of Exhibits 2, 3, and 4 to my Expert Report and Amended Expert Report where I limit the time period of the analysis to the time period in the Complaint, *i.e.,* between September 2015 (effectively December 2015) and October 2020. These Exhibits are attached hereto as Exhibit 4. O'Brien's net gain during this time period was $6,065,680.

across the six brokerage firms in the same month.[9] Finally, for each of the remaining twelve brokerage firms without commission data, I multiplied the estimate of the monthly commission rate by the number of traded shares associated with Coordinated Trading Events. This provides an estimate of the commissions for Coordinated Trading Events by brokerage by month. The total estimated commission across the twelve brokerage firms is $476,539.

13. I also estimated the SEC fees O'Brien potentially paid to brokerage firms for sales of securities during Coordinated Trading Events between December 2015 and May 2021. In particular, I used published historical rates for the SEC fees applicable to securities transactions as of the time of each Coordinated Trading Event to calculate the amount of the SEC fees O'Brien potentially paid on trades during his Coordinated Trading Events.[10] This calculation yields $229,620.[11] Combined with my estimates of the paid commissions, I estimate that O'Brien paid $868,358 in total commissions and fees to brokerage firms on his Coordinated Trading Events.[12]

14. Consequently, accounting for estimated commissions and fees, O'Brien earned net gains of $5,243,399 from all of his Coordinated Trading Events between December 2015 and May 2021.[13]

---

[9] For a few months with no trades across the six brokerages, I interpolated the monthly commission rate using a three-month moving average approach. For instance, for May 2017, I used the weighted average of monthly commission rates between February and April 2017.

[10] See, e.g., the SEC's Fee Rate Advisory #2 for Fiscal Year 2021, available at https://www.sec.gov/news/press-release/2021-8. The Commission determines the rates in accordance with Section 31 of the Securities Exchange Act of 1934.

[11] I understand that the SEC fee is charged to the exchanges and FINRA, who pass the fees on to brokerage firms, who then may or may not pass these onto their retail customers. In my calculation, I assumed that all of the brokerage firms used by O'Brien pass the SEC fees onto their retail customers.

[12] $868,358 = $162,199 + $476,539 + $229,620.

[13] $5,243,399 = $6,111,757 - $868,358.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: Los Angeles, CA
March 15, 2023

Evgeny (Eugene) Orlov