**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

                            Plaintiff,

    -against-

JAMES DAVID O'BRIEN,

                           Defendant.

---

Case No.:  1:21-cv-09575 (DLC)

 

## DEFENDANT JAMES DAVID O'BRIEN'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR MONETARY RELIEF

John M. Hanamirian, Esquire
Hanamirian Law Firm, P.C.
40 E. Main Street
Moorestown, NJ 08057
Telephone: (856) 793-9092
Facsimile: (856) 793-9121
jmh@hanamirian.com
*Attorney for Defendant*
*James David O'Brien*

# TABLE OF CONTENTS

Table of Authorities .................................................................................................................. ii

Preliminary Statement .............................................................................................................. 1

Factual Background .................................................................................................................. 7

    Disgorgement Cannot Be Ordered Until There is a Finding of a Securities Law Violation.. 10

    If The Court Finds That O'Brien's Pattern and/or Methodology of Trading Knowingly
    Violated Any Law, Regulation or Statute, O'Brien's Ill-Gotten Gains Must Be Limited to the
    Transactions Pled with Specificity by The Commission ........................................................ 12

    Assuming the Court Determines to Issue a Disgorgement Aware, The Ceiling, or Quantum
    of Said Disgorgement of O'Brien's "Ill-Gotten" Gains, Should Not Exceed 14.3% of
    O'Brien's Net Profit .............................................................................................................. 16

    If the Court Finds Securities Law Violation(s), a Tier One Penalty is the Only Appropriate
    Penalty Because Scienter is Required For Tier Two and Tier Three Penalties to Attach and
    Attach and the Commission has Failed to Prove O'Brien's Deceptive or Fraudulent Intent  18

Conclusion ............................................................................................................................... 19

## TABLE OF AUTHORITIES

**Cases**

Decker v. Massey-Ferguson Ltd., 681 F.2d 111, 114 (2d. Cir. 1982) ............................................. 13

In re Advanta Corp, Sec Lit., 180 F. 3d 525 (3d Cir. 1999) ............................................................. 13

Liu v. Sec. & Exch. Comm'n, 207 L. Ed. 2d 401, 140 S. Ct. 1936, 1949 (2020)...................... 10, 14

Press v. Chemical Inv. Servs. Corp., 166 F. 3d 529 ......................................................................... 13

SEC v. First Jersey Sec., Inc, 101 F.3d 1450, 1474-76 (2d Cir. 1996)............................................ 10

Securities and Exchange Com'n v. Texas Gulf Sulphur Co., 312 F. Supp. 77 (S.D.N.Y. 1970) ..... 11

Stevelman v. Alias Research Inc., 174 F.3d 79 (2d. Cir. 1999) ....................................................... 12

**Other Authorities**

Restatement (Third) of Restitution and Unjust Enrichment §51 ..................................................... 10

**Rules**

15 U.S.C. 77(d)(2)(A)........................................................................................................................ 18

15 U.S.C. 77t(d)................................................................................................................................. 18

Fed.R.Civ.P. 9(b) .............................................................................................................................. 13

**Regulations**

SEC Rule 10b-5(a) and (c)............................................................................................................ 8, 12

Section 17(a)(1) ............................................................................................................................ 8, 12

Securities Act of 1933................................................................................................................... 8, 12

Securities Exchange Act of 1934 ..................................................................................................8, 12

Defendant James David O'Brien ("Defendant" and/or "O'Brien") through his attorneys, Hanamirian Law Firm, P.C., submits this Memorandum of Law in Opposition to Plaintiff Securities and Exchange Commission's (the "Commission") Motion for Monetary Relief (the "Commission's Motion").

## PRELIMINARY STATEMENT

The Commission began their investigation of O'Brien over seven (7) years ago. During that time and until the filing of the Complaint in November 2021, no restraining order or temporary injunction was ever sought by the Commission to prevent Defendant's so-called "coordinated trading" despite the current assertion that O'Brien's trading "caused serious harm to the capital markets" (ECF 75, p. 9). During those seven years, the Commission spent thousands of hours accessing and (presumably) reviewing O'Brien's stock trading records, tax returns, bank statements, phone bills, emails, draft emails, and responses to discovery. The Commission obtained phone records (1) for O'Brien's elderly mother-in-law and her relatives in Minnesota whom O'Brien has never met; (2) the front desk of an apartment complex in which he lived in 2008; (3) a friend with whom he worked 20 years ago and the records of that person's wife; (4) in response to two separate subpoenas issued to O'Brien in each of May 2018 and 2019; and (5) in discovery in this case (which included O'Brien's actual physical mobile phones) all in an attempt to develop their case which has been, at best, speculative from the outset. Despite the volumes of documents received, the Commission represented to this Court that O'Brien had not fully complied with his production obligations in discovery (ECF No. 29), and the Court ordered O'Brien to turn over his computers and mobile phones within a twenty-four (24) period. (ECF No. 37). O'Brien complied. The Commission kept those computers and mobile phones for more than two (2) months, sought nothing further as a result of information obtained from those sources (including presenting to this Court any additional discovery requests), and did not amend its pleadings to reflect any additional claims

1

or any additional examples of purported fraudulent or unlawful conduct, instead remaining with the two "examples" of coordinated trading identified in the Complaint. (ECF No. 1, ¶¶1, 5, 6, 16, 17-20, 29, 30-49).

The Commission's experts each thereafter devoted over 140 hours (Orlov Dep. 29:10, Ex. "A"), analyzing O'Brien's trading records and thousands of hours of investigation on this case, not to mention the hundreds of hours of time spent in the underlying investigation that led to the filed Complaint (ECF No. 1), and yet, the experts analysis added only two additional examples of trading deemed to be problematic (ECF 57-6, Orlov Report pp. 9,11) and that trading netted a combined gross profit of $4,180 ($2,387 from his trading of the stock "LRCX", and $1,793 from "PRIM"). (ECF No. 76-2, Orlov Report 9-12). Nonetheless, the Complaint was not amended to include those two additional examples.  The Commission perpetuates the notion that "where there is smoke, there must be fire", but the Commission will not do the work necessary to support that notion. If Commission personnel have spent hundreds and hundreds of hours analyzing O'Brien's trading and other records, where are the results? The allegations in the Complaint are securities laws violations requiring proof of intent, not smoke and fire and certainly not smoke and mirrors. The Commission has to prove its case and it will not and cannot. Instead, the Commission perpetually asks the Court to make their case.

The Commission's Motion presupposes a finding by the Court that O'Brien engaged in more than 18,000 or 19,000 unlawful trading events (ECF 75 pp. 1, 3, 4), all of which "caused serious harm to the capital markets".  (ECF 75, p. 9).  The Commission refers to the number of trades at different times as comprising 18,000 or 19,000, perfectly even numbers that suggest they do not really know how many trades took place.  In fraud detection circles, the use of round numbers is a trigger for concocted data. Nevertheless, out of 18,000 or 19,000 purported trading events, the Commission filed its Complaint illustrating two specific occasions (one trading day in 2016 and

one in 2019) where O'Brien traded using a price discovery strategy which netted O'Brien a few thousand dollars. (ECF No. 1, pp. 20-25; Ex. "B" pp. 2, 10, 11, 14, 15).   Logically, if the Commission analyzed all of the data surrounding tens of thousands of trades, there would a report that reflects all of the problematic trading and the Complaint would reflect causes of action relative to each trade. The Complaint would also likely reflect the trades that are most advantageous to support the Commission's claims. Instead, we have a Complaint with only two instances of purported wrongful behaviors and it seems, they have to be the best examples. (ECF No. 1; pp. 20-25).   Instead, the Commission's pleadings and Motion are riddled with unsupported statements, partial truths, and dramatizations, which have permeated their entire case.   For example, the term "coordinated trading" is not a term O'Brien, nor for that matter the Commission's own employee-expert Dr. Orlov, ever knew or understood until the Complaint was filed.   (ECF No.1 ¶¶1, 5, 6, 16, 17-20, 29, 30-49; Orlov Dep. 20:20-21:6; 21:23-24:12, September 30, 2022, Exhibit "A").   Of course, the reason that is true is because the term "coordinated trading" does not exist in the securities laws or otherwise.   You cannot formulate the intent to violate a law that does not exist.

Next, the Commission's claim in their Motion that O'Brien traded "the same issuer on both sides" of a transaction and that is, again, purposefully misleading and is meant to create the impression that O'Brien traded on both sides of the market, washing stock trades and enticing others to trade, which is what the Commission would have liked to prove, but it is not this case. (ECF No. 75, p. 1).   The Commission then qualifies that term by saying that O'Brien's trades were "nearly simultaneous" now eliminating the notion that they could be wash sales, but still enjoying that deception at the outset. (ECF No. 75, p. 1).

Similarly, the Commission cites the Consent Judgment throughout their Motion but intentionally alters the negotiated phrase "except with respect to the quantum of disgorgement i.e. net profit", (ECF No. 71, p. 4; Ex. "B"). by omitting a portion of the actual verbiage, quoting only

"except with respect to the quantum of disgorgement".  (ECF No. 75, pp. 2, 8).  That phrase was

negotiated at length and has meaning. The effort to misquote is not a mistake. It is intentional and

telling. If the words did not have meaning, and meaning adverse to the Commission's arguments, it

seems the Commission would not have omitted them in presenting them to this Court. That

deceptive tactic of omission has been used throughout this entire case to attempt to villainize

O'Brien for conduct not present in the law.  Why can't the Commission rely on the record; the facts?

Why is it that our government personnel charged with enforcing the securities laws feels a need to

misrepresent the language of a document to this Court?

More of the same: The Commission identifies O'Brien's conduct as "egregious" and the need

to stop that behavior is identified as urgent, yet O'Brien was permitted to continue engaging in this

"egregious" behavior for years without any attempt to obtain injunctive relief. (ECF No. 75, pp. 1,

14).  The Commission and O'Brien have been interacting in the investigative and litigation portions

of this case since 2015 and the Commission filed its Complaint in late 2021. (ECF No. 1).  No effort

was made prior to the filing of the Complaint to curb or halt O'Brien's trading and the Commission

had all of the facts necessary to seek injunctive relief prior to the filing of the Complaint or

presumably would not plead seeking injunctive relief. The Commission's  perpetual use of flagrant

and inflammatory language to describe conduct that they allowed to continue serves no purpose

other than to deflect from the fact that it took them years to piece together the Complaint which

entirely fails to support the necessary showing of intent to prevail on the claims presented.    The

Commission has not and cannot set forth sufficient evidence which could lead the Court to conclude

that O'Brien engaged in unlawful "coordinated trades" (ECF No.1 ¶¶1, 5, 6, 16, 17-20, 29, 30-49),

which had the effect or intent of moving or manipulating the market(s) in a direction which could

be harmful to investors or the markets as a whole.

The Commission tries to "bootstrap" a conclusion of intent through the terms of the Consent

4

Judgment (ECF No. 71; Ex. "B"), but that is not what the Consent Judgment says. The Consent Judgment says that this Court will determine whether disgorgement is a proper remedy and thereafter the quantum of disgorgement and civil penalty, if any. (ECF No. 71 §IV; Ex. "B"). A law prohibiting coordinated trading does not exist and O'Brien agreeing not to violate a law that does not exist is not proof of a violation of the law that prompts the Court's imposition of a remedy of disgorgement or of a civil penalty. The remedies of disgorgement and a civil penalty each require specific findings of fact related to the underlying allegedly wrongful behaviors; they must or the measures associated with those remedies would be cast in terms of strict liability and they are not. Instead, the appropriateness of disgorgement in the first instance is grounded in a finding that the underlying behavior violates the law and thereafter, the quantum of disgorgement is determined by reference to the actual conduct and the instances of that conduct. The quantum of disgorgement relates to underlying proofs of fraudulent behavior in a specific manner, not merely through providing two (2) examples of trading in two stocks and assuming that the entirety of the trades must also violate the law. The Consent Judgment language confirms the foregoing by providing that this Court must, in the first instance, determine if disgorgement is appropriate. If disgorgement was a matter of presumption, that language would not exist. Recall, the Consent Judgment language is the property of the Commission and was represented as required to contain the language in its current form. (ECF 71; Ex. "B").

Because the Commission did not take the time to analyze or dissect more than a few of O'Brien's actual trades, they present absurd numbers to create a false picture for the sole purpose of trying to shock the Court into believing that O'Brien affected the stock trading markets and influenced the prices of thousands of stocks. The Commission's pleadings and arguments have been nothing more than a series of assumptions and adaptations with selective support. The Commission has not and cannot point to one investor who has been harmed by O'Brien's trading

strategy.  Moreover, since the Commission's own expert was not asked to analyze the effect of O'Brien's trading relative to the overall market, there is no way to quantify the impact, if any, of O'Brien's methodology.  Simply, the Commission either did not do the work associated with an analysis of O'Brien's stock trading or that analysis reveals only two instances of purported trading activity that violates some principle of trading that irks the Commission.

O'Brien agreed to resolve the injunctive relief component of this litigation by neither specifically admitting nor denying the allegations of the Complaint as indicated in the first paragraph of the Consent Judgment. (ECF No. 71; Ex. "B"). It seems it is okay to agree to not violating a law that does not exist. Further, O'Brien suffered a stroke and for the purpose of preserving his health and limiting the costs associated with further litigation, O'Brien agreed to simply address the issue as to the appropriateness of disgorgement and if any, the quantum of disgorgement, i.e., net profit, with this Court.

The Commission, however, still seems frustrated.

In 2018 and 2019, the Commission sought to charge O'Brien under the criminal statutes related to securities trading. The Commission issued a subpoena to O'Brien in May 2018. (Ex. "C"). O'Brien responded by offering a proffer and executing a proffer agreement with both the Commission and the United States Attorneys' Office for the District of New Jersey. (Exhibit "D"). O'Brien then participated in a proffer session with both of those governmental units wherein he described with particularity his trading activity. (ECF No. 57-1; O'Brien Dep. 19:5-20:13, June 30, 2022). The Commission continued their investigation and a year later, in May 2019, broke the proffer agreement with O'Brien and issued another identical subpoena. (Ex. "E"). (ECF No. 57-1; O'Brien Dep. 24:7-25:2, July 17, 2022).  Ultimately, O'Brien complied with the second subpoena. Still no criminal charges. When the Commission could not piece together a criminal charge

associated with O'Brien's trading they used the information obtained in the proffer session with O'Brien as the basis to form the Complaint. Another breach of the proffer agreement terms. The Commission then proceeded to pursue discovery in this case and alleged again that despite all efforts to comply with his discovery obligations, O'Brien was deficient, misrepresenting to this Court the true facts surrounding O'Brien's efforts. (ECF No. 29). The Court then ordered the remedy of O'Brien turning over his physical hard drive and mobile phones within twenty-four (24) hours. (ECF No. 37). He did so. After two months, O'Brien's counsel sought the return of those items. The records reveal that O'Brien's computer and phones were imaged by the Commission within two (2) days of receipt and that Commission merely held those items for two (2) months to further burden O'Brien. No amended pleadings were filed and no further assertions of a failure to comply with discovery were presented. There was no discovery deficiency.

The Commission is frustrated. The Commission thought O'Brien was someone engaged in a massive fraud similar to an organized crime prosecution that had been in the works on a parallel basis at that time and when it turned out that instead, O'Brien is merely a former professional market maker who was trading for his own account, the Commission proceeded to do anything and everything to "get O'Brien". It is enough now. O'Brien has spent a great deal of money, suffered a stroke, has been practically barred from trading solely as a result of the content of the filed Complaint and is now merely trying to get on with his life. He has been punished enough for trading in a manner that does not even violate a law.

It is for these reasons that the remedy of disgorgement is not appropriate in this case.

## FACTUAL BACKGROUND

On November 18, 2021, the Commission filed a Complaint in the United States District Court for the Southern District of New York (ECF No. 1) which alleges that O'Brien violated various

securities laws including Section 17(a)(1) and (3) of the Securities Act of 1933 as well as Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5(a) and (c).

The Appendices attached to the Commission's Complaint show that O'Brien executed two (2) sets of stock trades, each during the course of one day in 2016 and in 2019. (ECF No. 1, pp. 24-25). The two (2) examples, according to the Commission, are supposed to be indicative of a grander fraudulent scheme. The Complaint is predicated on the notion that if the trading pattern in those two stocks is problematic, then all of O'Brien's trading must be problematic without analyzing any other trading records or reviewing any other evidence.

The two (2) Appendices that delineate O'Brien's buy and sell orders in two symbols occur on two separate days, two- and one-half years apart. (ECF No. 1; pp. 20-25; ECF No. 57-4, Dorsey Dep., 118:21-119:6, October 6, 2022). Appendix A focuses on O'Brien's trading of Silicon Laboratories Inc., on September 29, 2016, under the symbol "SLAB". (ECF No. 1, pp. 21-22). Appendix B focuses on O'Brien's trading of Shopify Inc., on April 2, 2019, under the symbol "SHOP". (ECF No. 1, pp. 24-25). (Dorsey Expert Report 4, Exhibit "F").

Neither Appendix A nor Appendix B delineates all of the orders and executions associated with these symbols on the days in question, so it is impossible to conclude that O'Brien was responsible for market fluctuations, especially since his trading activity was minimal; immaterial. (ECF No. 1; pp. 20-25; ECF 57-4, Dorsey Dep., 42:14-43:16, October 6, 2022). In order for the Court to make a finding that O'Brien's small limit orders of 100 shares drove the market price down, one would have to know the extent of all market activity occurring at or near the same time as well as all price changes which occurred during the same time period. (Dorsey Expert Report 4, Ex. "F"; ECF No. 57-4, Dorsey Dep., 42:14-43:22, October 6, 2022). This process would have to occur for all 18,000 or 19,000 trading events that the Commission alleges are problematic in order for the Court

to order disgorgement of profits related to 18,000 or 19,000 transactions. With respect to SLAB, the Commission cannot be correct in its position that O'Brien caused the stock to decrease in price since their own report shows O'Brien did not place any orders to sell below $57.01 at the time indicated, yet the table provided shows the stock went down to $56.58, and accordingly, that change in value could not be attributable to O'Brien. (ECF No. 1, p. 22).

The Commission analysis is littered with similar analytical deficiencies. We also know that the allegations in the Complaint are that O'Brien's trades had two sides, one side intended to discover the price of a stock at a given time and the other to purchase the stock at a higher amount to generate a profit. (ECF No. 1). If that is true, both sides of a trade could not generate a profit and that reduces the potential analysis by at least half of the purported 18,000 or 19,000 instances (the number of trades is identified at different amounts, but oddly it is in each instance, an even number of trades).

Another example. Mr. Dorsey testified that O'Brien engaged in a strategy commonly used in the securities industry known as "price discovery". (Dorsey Expert Report 2, Ex. "F"; ECF No. 57-4, Dorsey Dep., 67:8-22, October 6, 2022). That practice gave O'Brien an improved understanding of where he could reasonably expect to receive executions for his buy market orders. Id. Moreover, O'Brien could not have possibly manipulated the market with regard to the two securities identified in Appendices A & B since the volumes on the days in question are much too large to allow O'Brien to "push the market down" using sell limit orders that were so few in number and so small in size. (ECF No. 1; pp. 20-25; Dorsey Expert Report 2, Ex. "F"; ECF No. 57-4, Dorsey Dep., 116:14-117:12, October 6, 2022). For the alleged 18,000 "coordinated trading events" (ECF No. 1, p. 2), the Commission never sought market data from all trading during the same time period, making the calculation related to the quantum of ill-gotten net profits earned impossible.

Instead of merely identifying two instances of purported wrongful conduct out of supposedly 18,000 or 19,000, the Commission could have easily obtained additional market data information on

9

both SLAB and SHOP with a simple request to the administrators of the securities information processors ("SIPs"), both of which the Commission regulates, and those records would have produced reams of relevant market data to support a proportionality analysis. (Dorsey Expert Report 5, Ex. "F"; ECF No. 57-4, Dorsey Dep., 167:5-22, October 6, 2022). The Commission could have made a document request to these administrators requesting all the information on orders, quotations, and trades necessary for a full and fair review of O'Brien's trading of SLAB and SHOP, including the "top-of- book" and the "depth-of-book" during the relevant time period, but they did not and assumedly did not want to do so because it was too much work? (*See* Dorsey Expert Report 5-6, Ex. "F"). One cannot possibly measure or quantify the supposed negative impact O'Brien's trading had on the market(s) or other investors without knowing this information. Examining O'Brien's trading in isolation, in thirty (30) second intervals, as described by the Commission's expert, Dr. Orlov, allows the Commission to distort the truth so that it fits within their narrative embodied in the Complaint and in the process, this Court is misled. (Dorsey Expert Report 6, Ex. "F").

I.   **Disgorgement Cannot Be Ordered Until There is a Finding of a Securities Law Violation**

A district court has broad equitable powers to order appropriate remedies, including the disgorgement of ill-gotten gains where it has *found* (italics added) securities law violations. <u>SEC v. First Jersey Sec.</u>, Inc, 101 F.3d 1450, 1474-76 (2d Cir. 1996). If securities laws violations are found, a disgorgement award which (1) does not exceed a wrongdoer's net profits; and (2) is awarded for victims, is a form of equitable relief the SEC is permitted to seek in enforcement actions. <u>Liu v. Sec. & Exch. Comm'n</u>, 207 L. Ed. 2d 401, 140 S. Ct. 1936, 1949 (2020). Generally, disgorgement is a form of "[r]estitution measured by the defendant's wrongful gain." Restatement (Third) of Restitution and Unjust Enrichment §51, Comment *a*, p. 204 (2010) (Restatement (Third)). Disgorgement requires that the defendant give up "those gains . . . properly attributable to

10

the defendant's interference with the claimant's legally protected rights." *Ibid*. Beginning in the 1970's, courts ordered disgorgement in SEC enforcement proceedings [***7] in order to "deprive . . . defendants of their profits in order to remove any monetary reward for violating" securities laws and to "protect the investing public by providing an effective deterrent to future violations." Securities and Exchange Com'n v. Texas Gulf Sulphur Co., 312 F. Supp. 77 (S.D.N.Y. 1970).

The Commission has not, and cannot show that O'Brien's "ill-gotten gains", if any, come from 18,000 or 19,000 trades during the period in question. The Commission has not examined 18 or 19 different trades, let alone 18,000 or 19,000 trading events, other than to determine that O'Brien's trading strategy fell within artificial constraints created exclusively for the purposes of this case and unknown to anyone in the securities marketplace except the Commission. The Commission simply developed a definition of coordinated trading, deemed it to be unlawful, invented artificial parameters to define it, and filed a Complaint against O'Brien for violating it. There are, of course, at a minimum, due process concerns associated with that approach to enforcement. O'Brien cannot be expected to effectively defend himself against a fictitious set of rules for which there is an element of intent needed when neither he nor anyone else could ever be aware of the existence of such a rule. With regard to the term "coordinated trading", the Commission's own expert, Dr. Orlov a full-time employee of the Commission, testified during his deposition that he "...ha[ve]n't seen this term" (Orlov Dep. 16:18-20, September 30, 2022; Ex. "A") and that he never heard the term coordinated trading before this case. He knew it only from the Complaint and doesn't "know where it came from." (Olov Dep. 17:12-16, 28:1-4, September 30, 2022, Ex. "A"). The Commission's expert then indicates in his deposition, despite never having heard this term, that he changed the definition of coordinated trading which is set forth in the Complaint and used his own definition in his report to examine the patterns of trading engaged in by O'Brien. (Orlov Dep. 21-23, September 30, 2022; Ex.

11

"A").  Dr. Orlov even manipulated the time frame (likely to get obtain a higher net profit figure for this Court) set forth in the Complaint by subtracting three months in the beginning of his evaluation and adding seven months to the end of his analysis, an action that creates a timeframe of purported behavior that  falls beyond the limits of those identified in the Complaint itself.  (ECF No. 75, p. 1 at footnote 1).   The Commission merely makes it up as they go along. Dr. Orlov most significantly instituted a timing component to coordinated trading where there is an instance of trading in the winner account in the opposite direction of the helper account and Dr. Orlov concludes that happens within thirty  (30) seconds of the helper accounts' order.  (Orlov Dep. 23:7-13, September 30, 2022; Ex. "A"). Not 29 seconds or 32 seconds, but strictly 30 seconds. All of this is absurd because there is no statutory scheme supporting the analysis and on its face and beyond, that effort is riddled with speculation or assumptions that are devoid of any factual predicate.  It is even unclear if the two examples of purported "coordinated trading" attached as Appendices to the Complaint would fall within Dr. Orlov's definition since the SLAB event took 38 seconds and the SHOP event took 122 seconds.  (ECF No. 1, pp. 24-25).  The rules continue to be made up as they go along.

II.     **If The Court Finds That O'Brien's Pattern and/or Methodology of Trading Knowingly Violated Any Law, Regulation or Statute, O'Brien's Ill-Gotten Gains Must Be Limited to the Transactions Pled with Specificity by The Commission**

The Complaint alleges violations of Section 17(a)(1) and (3) of the Securities Act of 1933, Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and  a violation of SEC Rule 10b-5(a) and (c).

The Commission's cited statutory authorities share one form of commonality, namely that the Commission must prove that O'Brien acted with scienter in the context of the claimed unlawful conduct. The Commission cannot satisfy their scienter and fraud pleading obligations by merely alleging "fraud by hindsight". Stevelman v. Alias Research Inc., 174 F.3d 79 (2d. Cir. 1999).

Rather, Fed.R.Civ.P. 9(b) provides "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity". The requisite proof of scienter in securities litigation mandates that a plaintiff plead scienter by alleging facts which give rise to a strong inference that a defendant had a motive and opportunity to commit fraud and most importantly to this case, the Commission was required to allege the requisite facts with particularity. Decker v. Massey-Ferguson Ltd., 681 F.2d 111, 114 (2d. Cir. 1982); In re Advanta Corp, Sec Lit., 180 F. 3d 525 (3d Cir. 1999); Press v. Chemical Inv. Servs. Corp., 166 F. 3d 529, 538 (2d Cir. 1999). The Commission has not done so.

Yes, O'Brien settled the claims relative to any violation of the securities laws going forward and for that purpose accepts that the Commission believes his trading violated the law, but that is not an acquiescence that he violated the law in 18,000 or 19,000 instances. Instead, O'Brien merely agreed that he will not do what the Commission alleges is wrongful. The imposition of a disgorgement and civil penalty, however, is not the same as agreeing not to violate the law going forward. The Commission must show with particularity that O'Brien's allegedly wrongful behaviors generated a net profit beyond the two instances pled with particularity in the Complaint. Otherwise, there is nothing for the Court to do in this case. O'Brien understands that in certain types of cases, for example, an insider trading case, the underlying violation reveals the amount of the ill-gotten gain. It is simple to calculate because the existence of the insider information relative to the particular stock in issue wraps itself around the ill-gotten gain and is easily identified. That is not this case. Any fraudulent behavior for purported coordinated trading that is violative of the law has to be supported by the record and the Commission has simply not done the work to create that record. If they had, presumably this Court would have awarded the Commission summary judgment. This Court did not do so. The existence of a Consent Judgment relative to restraints stemming from alleged behaviors surrounding two instances of trading identified in the Complaint is not proof of

fraud in support of 18,000 or 19,000 transactions and any related net profit. That is why the words
"i.e., net profits" exist in the Consent Judgement. (ECF No. 71 §IV, Ex. "B"). It is but an example
of what the Commission must prove to prevail on its claims relative to disgorgement.

O'Brien's trading was not intended to defraud anyone. O'Brien had a long history as a market
maker with reputable Wall Street firms where trading on both sides wasn't only part of the process,
it was his job.  O'Brien left the industry and began working for himself at home. The alleged
securities laws violations in the Complaint that afford a remedy of disgorgement each require proof
of intent that O'Brien simply did not have.  O'Brien's trading is best described as follows:

> *O'Brien can see the NBBO, which gives him the best bid and offer for a
> symbol. The best bid/offer consists of the price and the associated size.
> (Dorsey Expert Report 10, Ex. "F"). Also, using the NBBO he can see the
> total volume traded for the symbol.  Id.  O'Brien cannot see who may be
> lurking unseen at the NBBO as a big buyer (or seller).  He probes the market
> using small limit orders to test the waters to see it any buyers will bite.
> Essentially, O'Brien is fishing, using small limit orders as bait. (Dorsey
> Expert Report 10, Ex. "F"; ECF No. 57-4, Dorsey Dep., 71:12-18, October
> 6, 2022).*

Every violation alleged requires a finding of intent before the issue of disgorgement can even
be addressed.  Liu v. Sec. & Exch. Comm'n, 207 L. Ed. 2d 401, 140 S. Ct. 1936, 1949 (2020).
O'Brien testified on multiple occasions that price discovery did not include an intention to induce
anyone to do anything.  There was no trickery involved and O'Brien was placing actual bona fide
buy and sell orders.  If the Court finds that O'Brien's conduct was intentional and in violation of an
actual securities law, not one created by the Commission just for this case, the maximum number of
events appropriately analyzed for that purpose is those that related to SLAB and SHOP. Nonetheless,
O'Brien continues to deny the notion that he had any intent to defraud or deceive anyone at any time.
The Commission could not and did not charge O'Brien under the mirror criminal securities laws
statutes and waited a good seven years before seeking the extraordinary remedy of injunctive relief;
a form of relief that is by definition grounded in urgency. (ECF No. 75, pp. 1, 10).

The Commission attempts to garner support for their deficient pleadings by stating in their Motion that "brokerage firms repeatedly raised concerns about O'Brien's trading and closed his accounts…" which, not surprisingly, is not accurate. (ECF No. 75, p. 5). The few letters O'Brien received were form letters and are not dispositive proof of intentional wrongdoing at all. Those brokerage house notices are algorithm-based notices that are triggered by volume of trading and other factors and are intended to protect the brokerage houses from their own culpability for wrongful behavior. (ECF No. 57-4, Dorsey Dep., 107:23-108:13, October 6, 2022) (ECF No. 57-1, O'Brien Dep. 141:17-142:18, 160:22-161:19, 162:4-163:1, July 13, 2022). They are barely yellow lights, and they are certainly not red lights and in this instance, the likely event is that O'Brien did not even see those notices as O'Brien received many emails from brokerage houses as each of his trades was accompanied by an email confirming the terms of that particular trade.

Finally, the Commission offered two expert witnesses, Robert W. Lowry and Evgeny (Eugene) Orlov, Ph.D. Regardless of the fact that both are economically dependent on the Commission (Dr. Orlov is employed full time by the Commission and Mr. Lowry is a professional expert for the Commission), both expert reports are fundamentally flawed and suffer from the same fatal defect. Each report focuses solely on O'Brien's stock purchase or sale orders and show no regard for the other purchase or sale orders coming into the market during that time O'Brien was active. (Ex. "F", Dorsey Expert Report 1; ECF No.57-6 , Orlov Expert Report, ECF No. 57-5, Lowry Expert Report). The Commission expert reports both overlook potentially thousands of buy and sell orders and hundreds of quote changes for SHOP and hundreds of buy and sell orders and dozens of quote changes for SLAB. Id. As stated, the Commission could have obtained the proper analytical data to give this Court a clear and complete picture of how the top-of-book and depth-of-book were changing during the relevant periods. *(See* Dorsey Expert Report 11 at footnote 9, Ex. "F"). Obviously, obtaining that information was not helpful to advance the claims in the Complaint or the

15

data would have been obtained, but that data is necessary to be able to quantify how much, if any, O'Brien's gains were attributed to the use deceptive or deceitful methods, i.e. him controlling or manipulating the market, which is the entire crux of the Complaint.

Considering Mr. Lowry's vast experience and Dr. Orlov's impressive education, coupled with how easily the Commission could have obtained all the necessary market data on orders and quote changes, it seems the Commission expert reports can only serve to mislead the finder of fact and it appears that is the point.  (Dorsey Expert Report 11, Ex. "F").

Though O'Brien does not believe that his trading strategy violated any law, regulation or statute, and this statement is not a concession, if the Court finds that the Commission has proven that the record supports a conclusion that O'Brien's trading actually violated a securities law that affords disgorgement as a remedy, then the Court should begin its analysis of whether disgorgement is appropriate by considering only the two instances identified in the Complaint. If that disgorgement is appropriate, this Court should limit the remedy to that which is proven, two instances, and order a gross disgorgement limited to the amount equal to the net profit in the examples set forth in the Appendices to the Complaint and that amount should be reduced by commissions and other trading costs as well as the capital gains tax associated with those two transactions.   Any further remedy cannot be supported by the record or the law.

III.   **Assuming the Court Determines to Issue a Disgorgement Aware, The Ceiling, or Quantum of Said Disgorgement of O'Brien's "Ill-Gotten" Gains, Should Not Exceed 14.3% of O'Brien's Net Profit**

In the event the Court is inclined to order disgorgement in an amount greater than that which was plead with specificity in the Complaint, O'Brien should not be ordered to disgorge more than 14.3% of the net profit he may have made from September 2015 through October 2020[1], the

---

[1] The percentage should be slightly less since the Commission's experts calculate the trading activity through May 2021; rather than ending in October 2020.

timeframe set forth in the Complaint.  The Commission's expert report shows that O'Brien's "coordinated trading" events account for 64.3% of the overall dollar amount used to purchase securities.  (ECF No. 76-2, p. 5; Orlov Dep. 46:9-19, September 30, 2022, Ex. "A").  An effort to require that O'Brien disgorge every cent he made over the period in question without regard to whether those trades violate the law is inconsistent with the nature of the remedy which is to capture "ill-gotten" gains. Assume, however, that O'Brien wore a blindfold and picked stocks and trades on a random basis, he would have been correct half of the time without any price discovery so in essence, the accusation is that a 20+ year market maker veteran was able to "win" slightly more (6.4 out of 10) than what would happen randomly as a result of his "coordinated trading" methodology.  The delta between the successful trades he would have made absent his technique, versus the enhanced percentage, the performance above a random trader should be the measurement used for the quantum of disgorgement; 14.3%.

In calculating the 14.3%, the Court will need to only look at O'Brien's income tax returns for the years in question to compute the net profits earned from the "coordinated trading" activity, which can only be appropriately designated on his returns as "short term gains".  (Exhibit "G").  If all of the transactions happened within thirty (30) seconds as alleged, they certainly happened in less than a year and accordingly, can only be characterized as short-term capital gains under the Internal Revenue laws. 26 U.S.C. Section 1222.  O'Brien's short term capital gains for the years in issue as reported on his federal income tax returns are as follows:

| | |
|---|---|
| 2015 | $13,333 |
| 2016 | $2,119,240 |
| 2017 | $(298,171) |
| 2018 | $744,316 |
| 2019 | $610,187 |
| 2020 | $1,286,966 |

TOTAL SHORT TERM CAPITAL GAIN:  $4,475,871

This is the total potential amount of profits earned during the five-year period in question, before any reductions for commissions paid and capital gains taxes of roughly thirty percent (30%) between the federal and state taxing authorities.  Subtracting the combined short-term capital gain tax rate of 30%, which was already paid into the Treasury by O'Brien, the amount remaining is $3,133,109.70.  In addition, the trading in the Vanguard account did not and could not occur within thirty (30) seconds as Vanguard's platform does not allow trades to be processed in that time interval (the current trade time is 3 minutes). Accordingly, there is an appropriate total reduction of $1,209,208.85 for those trades in 2019 and 2020[2]. (Ex. "H"). Further, using the same methodology that the Commission used to calculate the brokerage commissions and fees paid on their gross claim of $10,427,669 in relation to the actual gross profit earned of $4,475,871, the commissions and broker's fees are equal to $372,725.50.  If one then subtracts the Vanguard trades, broker's fees and commissions paid of $1,581,934.35, the new net profit amount is $1,551,175.35 ($3,133,109.70 less $1,581,934.35). Then, applying a 50% rate for O'Brien under the theory that he would have been successful in trading at least half of the time without employing any methodology, a disgorgement amount of $110,909.03 ($1,551,175.35 divided by 2 and then multiplied by 14.3%) is the maximum that could be imposed, if any.

### III.    If the Court Finds Securities Law Violation(s), a Tier One Penalty is the Only Appropriate Penalty Because Scienter is Required For Tier Two and Tier Three Penalties to Attach and Attach and the Commission has Failed to Prove O'Brien's Deceptive or Fraudulent Intent

Pursuant to 15 U.S.C. 77t(d), the Commission is permitted, and the Court may choose to impose "upon a proper showing", a civil penalty to be paid by the person who committed such violation. Specifically, 15 U.S.C. 77(d)(2)(A) reads: "The amount of the penalty shall be

---

[2] For 2019, O'Brien's total short-term gain using the Vanguard platform was $99,835.25.  For 2020, O'Brien's total short-term gain using the Vanguard platform was $1,109,373.60.

determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (i) $5,000 for a natural person or $50,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation."

For the reasons stated herein, the Commission has not proven that O'Brien violated the law and the only examples of violations of the law that are supported by the record are two instances identified in the Appendices to the Complaint. Assuming that the Court finds that the Commission has met its burden of establishing violation(s) of its newly created law, it is clear the Commission has not proven that O'Brien had any knowledge he was breaking a law let alone that he intended to do so. The law with regard to the imposition of civil penalties is clear that in order to obtain a Tier II or Tier III penalty, scienter must be proven and that is not blanket scienter; specific proofs must exist in the record. This is a penalty and cannot be imposed on a random basis. The Commission calculation of a proposed penalty is from whole cloth, as are the balance of their claims in this matter.

## CONCLUSION

For the reasons set forth above, the Court should deny the Commission's Motion for Monetary Relief.

Dated:   April 2, 2023

John M. Hanamirian, Esquire
Hanamirian Law Firm, P.C.
40 E. Main Street
Moorestown, NJ 08057
Telephone: (856) 793-9092
Facsimile: (856) 793-9121
jmh@hanamirian.com
*Attorney for Defendant, James David O'Brien*

19

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of April 2023, the foregoing Response in Opposition to Plaintiff's Motion for Monetary Relief, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, and copies will be sent to those indicated as nonregistered participants via United States First Class Mail.

Dated: April 10, 2023

John M. Hanamirian, Esq.