UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                        :
SECURITIES AND EXCHANGE COMMISSION,     :
                                        :
                         Plaintiff,     :     21cv9575 (DLC)
                                        :
              -v-                       :     OPINION AND
                                        :     ORDER
JAMES DAVID O'BRIEN,                    :
                                        :
                         Defendant.     :
                                        :
---------------------------------------- X

APPEARANCES:

For plaintiff Securities and Exchange Commission:
Bennett Ellenbogen
Paul G. Gizzi
Chevon N. Walker
Richard R. Best
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004

For defendant James David O'Brien:
John M. Hanamirian, Esq.
Hanamirian Law Firm
40 E. Main Street
Moorestown, NJ 08057

DENISE COTE, District Judge:

     The Securities and Exchange Commission ("SEC") brings this

securities fraud action against James David O'Brien, alleging

that O'Brien engaged in a multimillion-dollar market

manipulation scheme.  On February 3, 2023, the parties settled

with respect to injunctive relief and stipulated that any claim

for monetary relief would be determined by the Court on a motion

by the SEC.  The SEC filed its motion for monetary relief on
March 17.  Based on the hearing held on May 19, and for the
following reasons, the SEC's motion for monetary relief is
largely granted.

**Background**

Before analyzing the appropriate amount of monetary relief,
the background of this case is described.  The first section
outlines O'Brien's manipulation scheme, as articulated in the
complaint.[1]  The second section explains the evidence relevant to
monetary relief that was submitted in connection with this
motion.  The third section describes the procedural history in
the case.

I.   Allegations in the Complaint

A.   O'Brien's Scheme

Between September 17, 2015 and at least October 29, 2020,
O'Brien, a securities trader, engaged in an ongoing market
manipulation scheme involving what the complaint calls
"coordinated trading events."  The complaint defines a
coordinated trading event as follows:

---

[1] As explained below, the parties agreed that for the purposes of
this motion, the factual allegations in the complaint are taken
as true, except with respect to the quantum of disgorgement.

- Two or more accounts trade and hold positions in the same exchange-traded stock, on the same day, and during the same period of time;

- The event starts when the first account trades and ends when all the involved accounts close out their positions (or when the trading day ends);

- At least one of the accounts behaves as a winner account -- an account that has an average transaction size greater than or equal to 1,000 shares; and

- At least one of the involved accounts behaves as a helper account -- an account that has an average transaction size of less than 500 shares and is held at a different brokerage firm than the winner account.

O'Brien engaged in a manipulative scheme in which he used the helper accounts to affect artificially the price of various stocks to the benefit of the winner accounts.  In doing so, O'Brien acted with the intent to induce other market participants to fill orders at the artificially inflated or deflated prices.

According to the complaint, O'Brien executed over 18,000 coordinated trading events in eighteen accounts at fourteen different brokerage firms.  For some of these events, O'Brien would start by placing several sell orders for a certain stock in the helper accounts.  This would create the false appearance of sell interest in the stock, which would artificially decrease the stock's price.  Then, O'Brien would acquire larger positions in the same stock in the winner accounts at the artificially

deflated price.  Once the winner accounts finished buying the stock, O'Brien often cancelled remaining open helper account sell orders.

For other coordinated trading events, O'Brien began by acquiring a position in a stock in the winner accounts.  Then, he would place a series of smaller buy orders for the same stock in the helper accounts to artificially increase the stock price. O'Brien would then liquidate the winner account positions at the inflated price and cancel remaining open buy orders in the helper account.

O'Brien aimed to generate profits for the winner accounts that were greater than the losses in the helper accounts. Through his actions, O'Brien intended to induce market participants to sell to and purchase from the winner accounts at prices that were artificially impacted by the helper accounts.

O'Brien's most active period of coordinated trading events occurred between mid-September 2015 and December 2016.  During this time, he engaged in 11,738 coordinated trading events using ten accounts at eight brokerage firms.  About 75% of O'Brien's coordinated trading events during this time resulted in net profits.  Even deducting the net-unprofitable coordinated trading events, O'Brien still obtained an overall net gain during this period.

O'Brien then reduced his coordinated trading, but he continued executing the events through at least October 2020. From January 2017 to October 2020, he engaged in over 6,300 coordinated trading events using at least nine accounts at seven brokerage firms.  Roughly 74% of the events during this time were net profitable, and, even deducting the events that led to net losses, O'Brien still obtained an overall net gain during this period, as well.

B.   O'Brien's Interactions with Brokerage Firms and the SEC

O'Brien attempted to hide his coordinated trading activity by executing the winner and helper trades in accounts held at different brokerage firms.  Nonetheless, several of the firms O'Brien used for his scheme identified his activity as potentially manipulative trading and sent warnings to him that explained relevant concepts of prohibited manipulation.  For example, in October 2015, one firm identified an apparent "wash trade" by O'Brien and explained to him that manipulative trading practices involve any trades that have the purpose of "[c]reating or inducing a false, misleading, or artificial appearance of activity in the security" or "setting a price that does not reflect the true state of the market in the security." These kinds of warnings also informed O'Brien that manipulative

trading practices are serious violations of exchange trading rules that could result in regulatory penalties.

In March 2016, a different firm contacted O'Brien about potential "layering" in his account.  The firm explained to O'Brien that layering

> involves the placement of multiple, non-bona fide, limit orders on one side of the market at various price levels . . . to create the appearance of a change in the levels of supply and demand, thereby artificially moving the price.  An order is then executed on the opposite side of the market at the artificially created price, and the non-bona fide orders are immediately canceled.

The firm stated that layering was a manipulative trading practice.

At least one firm also asked O'Brien directly whether he engaged in coordinated trading.  Specifically, in March 2019, a representative of one firm emailed O'Brien as follows:

> [T]rading activity in National General Hlgs (NGHC) on March 20, 20129 [sic] where your account appeared to submit multiple sell orders [in less than a minute] that appeared to contribute to the market quote narrowing from 24.31/24.77 to 24.26/24.34.  In addition, we noted your account submitting buy orders over [a period of approximately 30 seconds] that appeared to contribute to the market quote moving from 24.11/24.53 to 24.36/24.49.  <u>Please provide a written explanation regarding your investment strategy and rational [sic] for order placement NGHC.  Do you coordinate your trading with other accounts or individuals outside of [this firm]?</u>

(Emphasis added.)  Roughly three weeks later, O'Brien responded to the email generally, but did not answer whether he

coordinated his trading.  Thus, the firm representative
responded, "Would you please confirm the below question?  Do you
coordinate your trading with other accounts or individuals
outside of [this firm]?"  To this, O'Brien responded
misleadingly, "I don't coordinate with other individuals . . . .
I mostly trade off of Upgrades or recommendations on CNBC."
O'Brien did not mention that he was coordinating trades with
other accounts he held at other firms.

The accounts that O'Brien used for coordinated trading
events were often closed by brokerage firms.  When this
happened, O'Brien would open new accounts at other firms in his
or his wife's name to continue the coordinated trading scheme.
For example, in October 2015, a few weeks after sending O'Brien
the warning described above regarding wash trades, the firm
closed his account.  After the account was closed, O'Brien
increased his usage of a different account at a different firm.
Then, in the following months, he opened new accounts at two
other firms and used those accounts to continue his coordinated
trading events.

O'Brien never disclosed his coordinated trading when
brokerage firms asked about his trading activity.  For example,
one firm's compliance department asked the firm's branch manager

7

to contact O'Brien to discuss his trading activity.  The firm
told the branch manager:

> We'd like you to ask [O'Brien] how he chooses which
> stocks to trade; i.e., does he go by fundamental
> analysis, technical analysis, focus on specific
> sectors/industries, etc.?  Also, please ask him if he
> is using a 3rd party service (aside from what the firm
> provides) such as a website or automated trading
> software.  As I said on the phone, this is somewhat
> time sensitive.  Hopefully, you are able to get in
> touch with him and will not have to resort to leaving
> a message, telling him his internet access will be set
> to View Only until he returns your call.

The branch manager later reported back saying that O'Brien had
told him that he "[l]ooks primarily at momentum stuff, buys when
it falls 30/40 cents, likes to try to catch a bounce.  Likes to
stay in the same stocks he knows.  Says he doesn't use software.
'Trades the news'.  Not actively scanning."  In fact, however,
99% of the gains O'Brien earned in his accounts with that firm
were attributable to coordinated trading.  That is, rather than
just "looking at momentum" and "trying to catch a bounce,"
O'Brien was creating the momentum and the bounce through
coordinated trading events.  Roughly two weeks after the
communications between this firm and O'Brien, the firm closed
his accounts.

Finally, O'Brien continued to engage in coordinated trading
even after learning that the SEC was investigating him.  The SEC
subpoenaed O'Brien in May 2018 relating to his trading activity.

He provided a proffer to the SEC and criminal authorities in August 2018.  In May 2019, the SEC subpoenaed him a second time to provide testimony.  O'Brien refused to appear for testimony, and thus in October 2019, the SEC filed a subpoena enforcement proceeding.  He was ordered to testify in December 2019.  SEC v. O'Brien, 19 Misc. 468 (KPF), 2019 WL 7207485, at *4 (S.D.N.Y. Dec. 27, 2019).[2]  Despite these ongoing proceedings, O'Brien continued to engage in coordinated trading through at least October 2020.

II.  Evidence Submitted Regarding Calculation of Monetary Relief

   A.   The SEC's Submissions

        In connection with its motion for monetary relief, the SEC submitted several evidentiary materials relevant to calculating monetary relief.  Chief among these was an expert report (the "Orlov Report") from SEC Financial Economist Dr. Evgeny Orlov.

        In the Orlov Report, Dr. Orlov explains that he analyzed O'Brien's stock trading activity to identify instances of coordinated trading and calculate profits associated with such trading.  Dr. Orlov analyzed trade blotter data from 19

---

[2] O'Brien appealed the order requiring him to testify.  That appeal was denied on January 11, 2021.  SEC v. O'Brien, 842 F. App'x 652, 655 (2d Cir. 2021).

brokerage firms.[3]  Based on this data, Dr. Orlov concluded that O'Brien engaged in 19,308 coordinated trading events[4] between December 2015 and May 2021.[5]

The Orlov Report includes a detailed analysis of three specific coordinated trading events.  The Orlov Report also includes analysis on the profitability of O'Brien's coordinated trading activity.  Dr. Orlov concluded that of the 19,308 events he identified, 14,275 or 73.9% resulted in positive net profits totaling roughly $10.4 million.  The remaining events resulted in negative net returns totaling $4.3 million.  His activity resulted in an overall net gain of roughly $6.116 million.

---

[3] Dr. Orlov originally received data from 22 firms, but, after eliminating the repetitive data, analyzed data from only 19.

[4] Although Dr. Orlov opines that the definition of "coordinated trading event" used in the complaint is an appropriate description of the kind of trading activity engaged in by O'Brien, the definition he used in his report is slightly different than that used in the complaint.  According to Dr. Orlov, the minor variations resulted in a slightly more conservative analysis because: (1) Dr. Orlov analyzed only coordinated trading events that ended on the same day that they began; and (2) he required coordinated trading events to include at least one instance where (i) the direction of the transactions in the helper account was opposite the direction of the immediately following winner account transactions, and (ii) the winner account transactions did not lag the helper transactions by more than 30 seconds.

[5] The time period used in the Orlov Report is slightly longer than that used in the complaint because the trade blotter data analyzed by Dr. Orlov included trade data beyond October 2020. O'Brien testified that he engaged in the same kinds of coordinated trading behavior both before 2015 and after 2020.

Finally, the Orlov Report includes Dr. Orlov's analysis of whether coordinated trading events were unusually profitable for O'Brien relative to his other trading activity.  Dr. Orlov found that O'Brien spent $11.28 billion to purchase shares in coordinated trading events from December 2015 to May 2021. During the same period, O'Brien spent $17.533 billion to purchase shares in all of his trading activity, including both coordinated trading and non-coordinated trading.  Thus, 64.3% of the overall dollar amount spent to purchase stocks from December 2015 to May 2021 was spent on coordinated trading events.

By contrast, however, Dr. Orlov concluded that profits from coordinated trading events accounted for 95.4% of O'Brien's overall profits during that period.  Dr. Orlov arrived at that percentage by comparing O'Brien's overall profits from December 2015 to May 2021 -- $6.413 million -- to his profits from coordinated trading events during the same time -- $6.116 million.

Dr. Orlov also prepared an amended expert report (the "Amended Orlov Report") dated September 16, 2022.  In the Amended Orlov Report, Dr. Orlov explained that he analyzed additional trade blotter data from two other brokerage firms that he received after submitting his initial report.  He concluded that this data had only a minimal effect on his

11

initial results and therefore none of his opinions in the original report changed.  The Amended Orlov Report also provided certain responses to opinions offered by O'Brien's proffered expert, Michael Dorsey.  This section of the Amended Orlov Report is primarily relevant to O'Brien's liability and so is not summarized in this Opinion, which addresses the appropriate amount of monetary relief.

In connection with the instant motion, Dr. Orlov submitted a declaration (the "Orlov Declaration").  The Orlov Declaration incorporates his prior two reports and provides additional analysis directed at the relief requested by the SEC in its motion for monetary relief.  Specifically, because his reports did not account for trade commissions and fees in the net profit calculations, the Orlov Declaration includes analysis of these factors.

To calculate commissions, Dr. Orlov aggregated the commissions corresponding to coordinated trading events for six (out of eighteen total) brokerage firms that provided information on trade commissions in their blotter data.  The commissions from these six firms totaled $162,199.  Dr. Orlov then used blotter data from the same firms to estimate the monthly commission rate for each month by dividing the total monthly commissions across the six firms by the number of shares

12

purchased or sold across the six firms in the same month.  For the remaining twelve firms without data on commissions, Dr. Orlov multiplied the estimated monthly commission rate by the number of traded shares that were associated with coordinated trading events.  Based on this, Dr. Orlov concluded that the total estimated commissions across the twelve brokerage firms that did not submit commission data is $476,539.

To calculate the SEC fees that O'Brien may have paid to firms for sales of securities associated with coordinated trading events in the relevant time, Dr. Orlov used the published historical rates for SEC fees applicable at the time of each event.  This calculation yielded $229,620 in fees.  Dr. Orlov then aggregated his calculations for the fees, the commissions paid on the six firms that provided commission data, and the estimated commissions from the twelve firms that did not provide commission data.  This resulted in a total amount of commissions and fees of $868,358.

After calculating the total commissions and fees, Dr. Orlov calculated the final net profits on coordinate trading events from December 2015 to May 2021.  Subtracting $868,358 from $6,111,757, Dr. Orlov determined O'Brien's total net profits to be $5,243,399.  This is the disgorgement amount that the SEC seeks.

13

Finally, because, as explained above, the period originally examined by Dr. Orlov was slightly longer than that identified in the complaint, Dr. Orlov also calculated O'Brien's total net profits from December 2015 to October 2020 to reflect the shorter time frame of the complaint.  Dr. Orlov concluded that during this period, O'Brien earned a total net gain on coordinated trading events of $6,065,680.  Subtracting the same calculation of $868,358 in commissions and fees[6] would yield a total net profit of $5,197,322.

In addition to the materials from Dr. Orlov, the SEC also submitted a declaration from Stephen Johnson, a supervisory staff accountant at the SEC.  Johnson calculated prejudgment interest on the SEC's proposed disgorgement amount of $5,243,399 of $370,547.59.  After oral argument, the SEC submitted another declaration from Johnson that calculated prejudgment interest on an award of $6,065,680, which represented O'Brien's net gains during the period alleged in the complaint but did not account for commissions and fees paid by O'Brien.  Finally, the SEC submitted a declaration from attorney Bennett Ellenbogen, noting that the SEC had requested that O'Brien return a sworn statement of financial condition ("SFS") if he planned to argue that the

---

[6] Dr. Orlov did not present a different calculation of commissions and fees for the shorter period.

14

Court should consider his financial condition in deciding this motion.  The declaration from Ellenbogen explained that O'Brien never provided an SFS.

B.   O'Brien's Submissions

O'Brien also submitted evidentiary materials in his opposition to the SEC's motion.  These consist primarily of an affidavit and declaration from O'Brien himself.  The vast majority of the affidavit and declaration is devoted to O'Brien contending that his activities were not illegal, refuting the complaint's interpretation of O'Brien's trading activity, suggesting that the SEC has conducted a "witch hunt" to find him liable for securities fraud, and arguing that only two trades should be considered in analyzing the appropriate amount of disgorgement.  Only a handful of paragraphs are relevant to the calculation of disgorgement.  These paragraphs are substantially the same in the declaration and the affidavit and contend the disgorgement should be in the amount of $110,909.03.

In these paragraphs, O'Brien opines that he "should not be ordered to disgorge more than 14.3% of the net profit [he] may have made from September 2015 through October 2020."  To arrive at 14.3%, O'Brien first notes that the Orlov Report concluded that 64.3% of the dollar amount O'Brien spent to purchase securities from December 2015 to May 2021 was spent on

15

coordinated trading events.  He then contends, "If I wore a blindfold and picked stocks and trades on a random basis, I would have been correct half of the time without any price discovery."  (O'Brien uses the term price discovery to refer to the activity that the SEC terms coordinated trading.)  O'Brien thus appears to contend that 14.3% is a proper multiplier by subtracting 50% from 64.3%, although he provides no analysis as to why that is an appropriate calculation.

To arrive at a net profit figure, O'Brien starts by identifying a total short-term capital gain of $4,475,871 on his tax returns from 2015 to 2020.  This figure understates his profits from his coordinated trading, however, since those profits would have been reduced by his losses in the remainder of his trading.  O'Brien then subtracts from this number the short-term capital gain tax rate of 30%.  O'Brien calculates a further reduction for certain specific profits because he contends that trading at one firm, Vanguard, "did not and could not" occur within 30 seconds (as required by Dr. Orlov's conceptualization of coordinated trading).  Finally, O'Brien subtracts commissions and fees purportedly calculated using the SEC's method.  Notably, O'Brien estimates the commissions and fees based on the full $4,475,871, rather than the adjusted amount after the Vanguard trades and taxes were deducted.  After

subtracting all of these amounts, O'Brien arrives at a "new net profit amount" of $1,551,175.35.

Then, O'Brien purports to apply the multiplier he calculated earlier to this $1,551,175.35 amount.  Almost incomprehensibly, O'Brien states:

> [A]pplying a 50% rate for O'Brien under the theory that he would have been successful in trading at least half of the time without employing any methodology, a disgorgement amount of $110,909.03 ($1,551,175.35 divided by 2 and then multiplied by 14.3%) is the maximum that could be imposed, if any.

Of course, $110,909.03 is not 50% of $1,551,175.35, nor is it 14.3% of that number.  Instead, it is 7.15% of $1,551,175.35.

To summarize, to the extent that O'Brien's statements on disgorgement can properly be termed "analysis," that analysis is as follows.  Start by assuming (without any support) that in a but-for scenario, O'Brien would have been successful in his trading activity 50% of the time.  Then, subtract 50% from 64.3% even though the 64.3% represents not the profits earned on O'Brien's trades in the relevant time, but rather the proportion of funds O'Brien spent on coordinated trading activity.  Take that 14.3% and arbitrarily divide it by two to yield 7.15%.  Then, apply that 7.15% multiplier to a net profit amount that is determined by using the short-term capital gains on O'Brien's tax returns (again without meaningful explanation for why that is an appropriate reference point) and applying almost $3

million in reductions that are summarily justified.  Using this method, O'Brien contends that the maximum permissible disgorgement amount is \$110,909.03.

III. Procedural History

The SEC filed this action on November 18, 2021, asserting three claims: (1) violations of §§ 17(a)(1) and (3) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77q(a)(1), (3); (2) violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a), (c); and (3) violations of Exchange Act § 9(a)(2), 15 U.S.C. § 78i(a)(2).  O'Brien timely filed an answer to the complaint on February 4, 2022.

On November 3, after discovery, O'Brien filed a motion for summary judgment.  The following day, the plaintiff filed a cross motion for summary judgment.  On January 6, 2023, both motions were denied, and trial was set to commence on March 13.

On February 3, the parties filed a letter noting that they had reached a partial settlement that would resolve the non-monetary relief sought in the case.  The letter included a proposed partial consent judgment (the "Judgment"), the defendant's written consent to that Judgment (the "Consent"),

and a stipulation.  Also on February 3, the Court entered the

Judgment.  The Judgment ordered, in pertinent part that

> [u]pon motion of the Commission, the <u>Court shall</u>
> <u>determine whether it is appropriate to order</u>
> <u>disgorgement of ill-gotten gains and/or a civil</u>
> <u>penalty</u> pursuant to Section 20(D) of the Securities
> Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the
> Exchange Act [15 U.S.C. § 78u(d)(3)] <u>and, if so, the</u>
> <u>amount(s)</u> of the disgorgement and/or civil penalty.
> <u>If disgorgement is ordered, Defendant shall pay</u>
> <u>prejudgment interest thereon, calculated from June 1,</u>
> <u>2021</u>, based on the rate of interest used by the
> Internal Revenue Service for the underpayment of
> federal income tax as set forth in 26 U.S.C.
> § 6621(a)(2).  In connection with the Commission's
> motion for disgorgement and/or civil penalties, for
> and <u>at any hearing</u> held on such a motion: (a)
> <u>Defendant will be precluded from arguing that he did</u>
> <u>not violate the federal securities laws as alleged in</u>
> <u>the Complaint</u>; (b) Defendant may not challenge the
> validity of the Consent or this Judgment; (c) solely
> for the purposes of such motion, the <u>allegations of</u>
> <u>the Complaint shall be accepted as and deemed true by</u>
> <u>the Court except with respect to the quantum of</u>
> <u>disgorgement, i.e., net profits</u>; and (d) the Court may
> determine the issues raised in the motion on the basis
> of affidavits, declarations, excerpts of sworn
> deposition or investigative testimony, the sworn
> testimony of the Defendant before the Court (subject
> to cross-examination by the Plaintiff) and documentary
> evidence, without regard to the standards for summary
> judgment contained in Rule 56(c) of the Federal Rules
> of Civil Procedure.

(Emphases added.)

The Consent provided, <u>inter alia</u>, that the Defendant

"waives the entry of findings of fact and conclusions of law

pursuant to Rule 52 of the Federal Rules of Civil Procedure" and

"waives the right, if any, to a jury trial and to appeal from

the entry of the Judgment."  In the Consent, the defendant also
agreed that he

> (i) <u>will not take any action</u> or make or permit to be
> made any public statement <u>denying</u>, directly or
> indirectly, <u>any allegation in the complaint or
> creating the impression that the complaint is without
> factual basis</u>; (ii) will not make or permit to be made
> any public statement to the effect that Defendant does
> not admit the allegations of the complaint, or that
> this Consent contains no admission of the allegations,
> without also stating that the Defendant does not deny
> the allegations; [and] (iii) upon the filing of this
> Consent, Defendant hereby <u>withdraws any papers filed
> in this action to the extent that they deny any
> allegation in the complaint.</u>

(Emphases added.)  The Consent is "incorporated into the

Judgement with the same force and effect as if fully set forth

therein."

On March 17, the SEC filed a motion for monetary relief in

the form of disgorgement, prejudgment interest, and civil

penalties.  On March 29, the defendant submitted a letter

indicating his intent to offer his own testimony.  Accordingly,

pursuant to this Court's individual practices for non-jury

trials, the defendant was ordered to file an affidavit

containing his direct testimony and the plaintiff was ordered to

indicate, subsequent to the filing of the affidavit, whether it

intended to cross examine the defendant.

On April 6, the defendant filed his papers in opposition to

the motion for monetary relief, including an affidavit

containing his direct testimony.  On April 11, the SEC moved to strike almost all of the direct testimony as in violation of the Consent.  The Court advised the parties that it intended to enforce the defendant's February 3 Consent, but denied the motion to strike on April 18.  That same day, the SEC indicated its intent to cross examine the defendant.

The defendant appeared for cross examination on May 19. After the defendant's testimony, both parties presented oral argument on the motion for monetary relief.

## **Discussion**

I.  Disgorgement

    A.  Liability

O'Brien's liability under the relevant provisions of the securities laws is addressed first.  The complaint brings market manipulation claims against O'Brien under §§ 9(a)(2) and 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder, as well as claims under §§ 17(a)(1) and (3) of the Securities Act.

Section 10(b) of the Exchange Act states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange --

. . .

21

> (b) To use or employ, in connection with the purchase
> or sale of any security registered on a national
> securities exchange or any security not so registered,
> or any securities-based swap agreement <u>any
> manipulative or deceptive device or contrivance</u> in
> contravention of such rules and regulations as the
> Commission may prescribe as necessary or appropriate
> in the public interest or for the protection of
> investors.

15 U.S.C. § 78j(b) (emphasis added).  Rule 10b-5, in turn,

provides in pertinent part:

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce, or of the mails or of any
> facility of any national securities exchange,
>
> (a) To employ <u>any device, scheme, or artifice to
> defraud</u>,
>
> . . .
>
> (c) To engage in <u>any act, practice, or course of
> business which operates or would operate as a fraud or
> deceit</u> upon any person,
>
> in connection with the purchase or sale of any
> security.

17 C.F.R. § 240.10b-5 (emphases added).  A violation of § 10(b)

and Rule 10b-5 may be premised on a defendant's use of a

fraudulent device, with scienter, in connection with the

purchase or sale of securities.  <u>SEC v. Pentagon Cap. Mgmt. PLC</u>,

725 F.3d 279, 285 (2d Cir. 2013).

Section 10(b) prohibits "manipulative acts."  <u>Set Cap. LLC
v. Credit Suisse Grp. AG</u>, 996 F.3d 64, 76 (2d Cir. 2021)

(citation omitted).  In the context of the securities laws, the
term manipulative

> refers generally to practices, such as wash sales,
> matched orders, or rigged prices, that are intended to
> mislead investors by artificially affecting market
> activity, and connotes intentional or willful conduct
> designed to deceive or defraud investors by
> controlling or artificially affecting the price of
> securities.

Id. (citation omitted).  Trading that is "engineered to
stimulate" supply or demand and that tricks investors into
trading based on mistaken beliefs about the market may
constitute manipulative activity if the alleged manipulator
"injected inaccurate information into the marketplace or created
a false impression of supply and demand for a security for the
purpose of artificially depressing or inflating the price of the
security."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d
87, 101 (2d Cir. 2007) (citation omitted).  Whether activity
artificially affects a security's price generally depends on
"whether the transaction or series of transactions sends a false
pricing signal to the market or otherwise distorts estimates of
the underlying economic value of the securities traded."  Set
Cap. LLC, 996 F.3d at 76 (citation omitted).

Liability under § 10(b) and Rule 10b-5 also requires proof
of scienter, which the Supreme Court has defined as an "intent
to deceive, manipulate or defraud" or "knowing or intentional

23

misconduct."  <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 194

n.12, 197 (1976).  The requisite scienter "may be established

through a showing of reckless disregard for the truth, that is,

conduct which is highly unreasonable and which represents an

extreme departure from the standards of ordinary care."  <u>SEC v.</u>

<u>Sourlis</u>, 851 F.3d 139, 144 (2d Cir. 2016) (citation omitted).

Mere negligence, however, is insufficient.  <u>SEC v. Obus</u>, 693

F.3d 276, 286 (2d Cir. 2012).  Proof of scienter "need not be

direct, but may be a matter of inference from circumstantial

evidence."  <u>Valicenti Advisory Servs., Inc. v. SEC</u>, 198 F.3d 62,

65 (2d Cir. 1999) (citation omitted).

Section 17(a) of the Securities Act is similar to § 10(b)

of the Exchange Act and Rule 10b-5.  Section 17(a) provides:

It shall be unlawful for any person in the offer or
sale of any securities (including security-based
swaps) or any security-based swap agreement . . . by
the use of any means or instruments of transportation
or communication in interstate commerce or by use of
the mails, directly or indirectly --

(1) to <u>employ any device, scheme, or artifice to</u>
<u>defraud</u>; or

. . .

(3) to engage in <u>any transaction, practice, or course</u>
<u>of business which operates or would operate as a fraud</u>
<u>or deceit</u> upon the purchaser.

15 U.S.C. § 77q (emphases added).  The requirements for a

violation of § 17(a) apply only to a sale of securities, but, to

the extent relevant here, are otherwise "the same as Section

24

10(b) and Rule 10b-5." <u>Pentagon Cap. Mgmt. PLC</u>, 725 F.3d at
285.

Finally, § 9(a)(2) of the Exchange Act provides:

It shall be unlawful for any person, directly or
indirectly, by the use of the mails or any means or
instrumentality of interstate commerce, or of any
facility of any national securities exchange, or for
any member of a national securities exchange --

. . .

(2) To effect, alone or with 1 or more other persons,
a <u>series of transactions</u> in any security registered on
a national securities exchange, any security not so
registered, or in connection with any security-based
swap or security-based swap agreement with respect to
such security <u>creating actual or apparent active
trading in such security, or raising or depressing the
price of such security, for the purpose of inducing
the purchase or sale of such security by others</u>.

15 U.S.C. § 78i(a)(2) (emphases added).  Section 9(a)(2) does

not proscribe all market transactions that raise or lower the

price of a security.  <u>Chris-Craft Indus., Inc. v. Piper Aircraft

Corp.</u>, 480 F.2d 341, 383 (2d Cir. 1973).  Rather, its purpose is

to "outlaw every device used to persuade the public that

activity in a security is the reflection of a genuine demand

instead of a mirage."  <u>Crane Co. v. Westinghouse Air Brake Co.</u>,

419 F.2d 787, 794 (2d Cir. 1969) (citation omitted).  Proof of a

violation of § 9(a)(2) requires evidence of "manipulative motive

and willfulness," which are normally inferred from the

circumstances of the case.  <u>Id.</u>

Taking the allegations in the complaint as true, the SEC has shown that O'Brien violated §§ 9(a)(2) and 10(b) of the Exchange Act, and Rule 10b-5 thereunder, as well as § 17(a) of the Securities Act.  O'Brien engaged in an ongoing manipulative scheme to inflate and decrease artificially the prices of securities through coordinated trading events.  Using these events, O'Brien misleadingly simulated buy or sell interest in various securities, which impacted the price of those securities.  O'Brien intended to use his coordinated trading events to induce other investors to purchase or sell securities at prices that had been artificially adjusted by his activity.

Additionally, O'Brien acted with the intent to defraud and with a manipulative motive.  O'Brien designed and executed a complex manipulative trading scheme.  O'Brien was warned multiple times by brokerage firms that his activity was suspicious and could constitute a serious violation of the securities laws.  When one firm questioned him outright about whether he coordinated trading, he misleadingly avoided the question.  Indeed, he never disclosed to any firm that he engaged in coordinated trading.  When multiple firms closed his accounts after reviewing his activity, O'Brien shifted his coordinated trading to other accounts at other firms.  And, even after the SEC's investigation of O'Brien began, he continued to

26

engage in the same manipulative trading behavior.  Thus, there
is ample support in the factual allegations of the complaint to
show that O'Brien violated the securities as alleged.

   In utter disregard of his agreement in the Judgment not to
argue that he did not violate the securities laws, O'Brien now
presents various arguments that his actions were not unlawful.
Even if O'Brien were permitted under the Judgment to make such
arguments, the arguments are meritless.  O'Brien first takes
issue with the complaint's use of the term "coordinated trading
events," arguing that the SEC has invented the term and that the
events are not a securities violation.  Contrary to O'Brien's
contentions, the term is irrelevant.  What matters is that
O'Brien's trading activity -- whatever one calls it --
artificially inflated or depressed the prices of securities and
was designed to induce investors to sell and purchase securities
at artificially impacted prices.  This, coupled with O'Brien's
scienter, is sufficient to show a violation of the securities
laws at issue.

   O'Brien also argues that he did not act with the requisite
scienter.  He notes that he "testified on multiple occasions"
that he did not intend "to induce anyone to do anything."  He
also contends that the notices he received from brokerage firms
about his trading before the firms closed his accounts did not

27

sufficiently alert him to any suspicious trading activity and that he "likely" did not see the notices.  But there are sufficient factual allegations in the complaint that, taken as true, show that O'Brien acted with the requisite intent.  The manipulation scheme was complex and required a concerted effort to design and execute.  In addition to the letters from the firms, O'Brien never disclosed his coordinated trading activity to brokerage firms, even when one firm inquired about his strategy in general and another firm asked him directly if he coordinated his trades.  Moreover, O'Brien placed the helper and winner accounts at different firms to help obscure his coordinated activity.  Additionally, O'Brien continued to engage in the same activity after several firms closed his accounts and the SEC commenced its investigation.[7]

Finally, O'Brien argues that because the complaint contains only two detailed examples of coordinated trading events, those are the only events that may support a violation.  But the examples in the complaint are exactly that -- examples.  That is, although the complaint contains factual allegations

---

[7] At oral argument on the motion, defense counsel suggested that the allegations in the complaint that directly stated that defendant acted with the relevant scienter were legal conclusions and thus should not be taken as true.  As explained above, however, the allegations extend far beyond mere legal conclusions as to defendant's scienter and instead include significant circumstantial evidence of his state of mind.

indicating that O'Brien engaged in several thousand coordinated
trading events, it provides a detailed analysis of two such
events.  The fact that only two events are explained in detail
is not sufficient reason to disregard factual allegations --
which O'Brien agreed to accept as true for the purposes of this
motion -- indicating that O'Brien engaged in roughly 18,000
coordinated trading events.  Thus, O'Brien is liable under the
securities laws, and his arguments to the contrary (even setting
aside that he agreed in the Judgment not to present them) are
without merit.  The magnitude of O'Brien's scheme informs the
decisions reached below.

B.   Disgorgement Amount

O'Brien shall disgorge $5,197,322.  "Once the district
court has found federal securities law violations, it has broad
equitable power to fashion appropriate remedies, including
ordering that culpable defendants disgorge their profits."  SEC
v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013) (citation
omitted).  Disgorgement is "a remedy tethered to a wrongdoer's
net unlawful profits."  Liu v. SEC, 140 S. Ct. 1936, 1943
(2020).  The amount of disgorgement ordered may not "exceed the
gains made upon any business or investment, when both the
receipts and payments are taken into the account."  Id. at 1949-
50 (citation omitted).  "The district court has broad discretion

not only in determining whether or not to order disgorgement but
also in calculating the amount to be disgorged." SEC v.
Contorinis, 743 F.3d 296, 301 (2d Cir. 2014) (citation omitted).

The Second Circuit applies a two-step framework for
calculating equitable monetary relief.  A plaintiff must first
show that its calculations are a "reasonable approximation" of
the amount of a defendant's unjust gains, and then the defendant
may show that those figures are inaccurate.  Razmilovic, 738
F.3d at 31-32. "If the disgorgement amount is generally
reasonable, any risk of uncertainty about the amount falls on
the wrongdoer whose illegal conduct created that uncertainty."
SEC v. Fowler, 6 F.4th 255, 267 (2d Cir. 2021) (citation
omitted).

The calculations of Dr. Orlov for the period of trading
alleged in the complaint represent a conservative approximation
of the amount of O'Brien's unjust gains.  Dr. Orlov analyzed
several thousand coordinated trading events, which formed the
substance of O'Brien's scheme, and determined that, for the
period alleged in the complaint, O'Brien received profits of
$6,065,680.[8]  Subtracting Dr. Orlov's estimate of commissions and
fees yields a net amount of $5,197,322.

---

[8] Although the SEC contends that disgorgement of a larger amount,
based on a slightly larger period, is warranted, the parties
agreed to decide this motion on the basis of the facts alleged

The SEC having established a reasonable approximation of the net profits from the scheme, the burden shifts to O'Brien to show that the figure is inaccurate.  O'Brien's arguments with respect to the disgorgement amount all fail.  First, O'Brien contends that disgorgement should be calculated with reference to amounts identified in his tax returns as his total short-term capital gains.  But he does not explain why these figures are an appropriate measure of his unlawful gains.  According to Dr. Orlov, O'Brien's unlawful trading activity was unusually profitable for O'Brien relative to his other trading.  Thus, the total amounts recorded as short-term capital gains on O'Brien's tax returns have likely been reduced by losses incurred in other trading, which would underestimate the gains from his coordinated trading events.

Similarly, O'Brien argues that the total amount of his net profits should be reduced by the tax rate applicable to his short-term capital gains, since he has already paid those funds to the Treasury.  This argument, too, fails.  O'Brien offers no

---

in the complaint.  Accordingly, coordinated trading events that may have occurred beyond the time identified in the complaint are not included here.

authority suggesting that tax payments are relevant to the
disgorgement analysis.[9]

O'Brien also proposes deducting amounts representing the
trades in his Vanguard account.  According to O'Brien, it took
over 30 seconds for Vanguard to process the trades in the
account, which means that those trades could not have happened
quickly enough to meet Dr. Orlov's definition of coordinated
trading.  This misconstrues Dr. Orlov's definition of the term.
Dr. Orlov's definition required that each coordinated trading
event include at least one instance where O'Brien placed a
winner account order that did not lag a connected helper account
transaction by more than 30 seconds.  He did not, however,
require that all the coordinated transactions be processed by
the brokerage firms within 30 seconds.  O'Brien acknowledged at
the hearing that it was possible for him to place orders for
trading through his Vanguard account within 30 seconds.  Thus,
O'Brien has presented no basis to conclude that the Vanguard
transactions should be excluded.

---

[9] At the hearing on this motion, the defendant suggested that the
Supreme Court's decision in Liu justified deducting his personal
income taxes.  But Liu requires only that courts "deduct
legitimate expenses before ordering disgorgement under
§ 78u(d)(5)."  Liu, 140 S. Ct. at 1950.  The SEC's proposed
disgorgement amount accounts for legitimate expenses in the form
of commissions and fees paid by O'Brien.  Nothing in Liu states
or suggests that personal income taxes must be deducted from the
disgorgement amount.

Finally, O'Brien's remaining arguments that certain amounts should be deducted from the disgorgement calculation also fail as they lack any support.  His contention, for example, that in a but-for world he would have succeeded in his trading 50% of the time is not justified with any analysis or evidence. Likewise, his use of that assumption to try to justify awarding only 7.15% of the total amount of his flawed calculation of his net profits is mystifying.  Accordingly, O'Brien's arguments are without merit, and it is appropriate to order disgorgement in the amount of $5,197,322.

II.  Prejudgment Interest

"Since the primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of their ill-gotten gains," district courts may "award prejudgment interest on the disgorgement amount for the period during which a defendant had the use of his illegal profits." Razmilovic, 738 F.3d at 36 (citation omitted).  In determining whether to award prejudgment interest, a district court should consider

> (i) the need to fully compensate the wronged party for actual damages suffered, (ii) fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.

Frommert v. Conkright, 913 F.3d 101, 109 (2d Cir. 2019) (citation omitted).  These same factors also inform a court's

33

decision to use a particular interest rate, "which must not result in over-compensation to the plaintiff." Id. (citation omitted).  Here, the parties agreed that, in connection with the instant motion, they would calculate any prejudgment interest using "the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2)."

The parties' agreed-upon interest rate shall be applied. Prejudgment interest is appropriate in this case because O'Brien had use of his ill-gotten gains for several years and thus failing to award such interest would not adequately address the remedial purpose of the disgorgement award.

The SEC originally calculated prejudgment interest of roughly $370,547.  This number was based on a disgorgement amount of $5,243,399, which was calculated based on a period of coordinated trading that extended beyond the period alleged in the complaint.  At oral argument, the Court requested that the SEC provide an updated calculation based on an award calculated solely using the period alleged in the complaint.  In response, the SEC filed a new calculation, but that calculation did not account for any deductions reflecting commissions and fees paid by O'Brien.  Accordingly, neither of the SEC's calculations is appropriate.

O'Brien does not take issue with the method the SEC used to calculate prejudgment interest, however, nor with the time period used to determine that interest.  Thus, the same method and period will be applied to the correct disgorgement amount of $5,197,322.  Applying the SEC's method for calculating interest over the same period to a violation amount of $5,197,322 yields prejudgment interest of $367,291.36.  Prejudgment interest in that amount is awarded.

A.   Payment to the Treasury

Disgorgement may be ordered under 15 U.S.C. § 78u(d)(5), which authorizes "any equitable relief that may be appropriate or necessary for the benefit of investors."  See Liu, 140 S. Ct. at 1942-43.  Because § 78u(d)(5) is limited to relief that is "appropriate or necessary for the benefit of investors," the SEC must, in general, "return a defendant's gains to wronged investors for their benefit."  Liu, 140 S. Ct. at 1948.  It is an open question, however, whether depositing disgorgement funds with the Treasury is justified under § 21(d)(5) "where it is infeasible to distribute the collected funds to investors."  Id.  Courts have held, post-Liu, that disgorgement may still be ordered even if funds need to be sent to the Treasury because it is infeasible to return funds to individual investors.  See,

e.g., SEC v. Bronson, 602 F. Supp. 3d 599, 618 (S.D.N.Y. 2022)
(collecting cases).

Additionally, after Liu, Congress enacted amendments to the
relevant portion of the Exchange Act, suggesting that courts
have greater discretion to order disgorged funds to be deposited
with the Treasury.  Specifically, in 2021, Congress modified the
Exchange Act to add § 78u(d)(7).  See William M. (Mac)
Thornberry National Defense Authorization Act for Fiscal Year
2021, Pub. L. No. 116-283, 134 Stat. 3388, 4626.  That section
provides that "[i]n any action or proceeding brought by the
Commission under any provision of the securities laws, the
Commission may seek, and any Federal court may order,
disgorgement."  Unlike the provision authorizing equitable
relief, which was addressed in Liu, § 78u(d)(7) does not include
language requiring any relief to be "for the benefit of
investors."

Disbursement to the Treasury is appropriate in this case.
O'Brien's scheme involved over 18,000 coordinated trading
events, many of which were executed in a matter of seconds.  The
investors harmed by O'Brien's activity include those who traded
the relevant securities during one of the coordinated trading
events.  The SEC contends, understandably, that it would be
enormously difficult, if not impossible, to identify all those

36

harmed by O'Brien's activity and to disburse the disgorgement funds to those investors.  Finally, O'Brien does not dispute that disbursement to the Treasury is appropriate.

III. Civil Penalties

A civil penalty of $10,315,065 is imposed.  15 U.S.C. §§ 77t(d)(2) and 78u(d)(3) allow a court to impose a civil penalty for "each violation" of the securities laws.  Those sections provide for three tiers of civil penalties, the most serious of which are Tier III penalties.  Fowler, 6 F.4th at 264.  Tier III penalties may be imposed "for each . . . violation" that involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons."  15 U.S.C. §§ 77t(d)(2)(C); 78u(d)(3)(b)(iii).  The maximum Tier III penalty is the greater of "the gross amount of pecuniary gain to [the] defendant as a result of the violation" or a maximum statutory amount that is adjusted for inflation. Id. §§ 77t(d)(2)(C); 78u(d)(3)(b)(iii); Fowler, 6 F.4th at 264. The current statutory maximum penalty for Tier III penalties for natural persons is $223,229 per violation.  See Adjustments to Civil Monetary Penalty Amounts, SEC Release Nos. 33-11143, 34-96605, 2023 WL 1290981, at *2 (Jan. 6, 2023).

The term "violation" is undefined in the statute.  Courts have held that each violative trade in an overall scheme may constitute a separate violation.  See, e.g., Pentagon Cap. Mgmt. PLC, 725 F.3d at 288 n.7 (2d Cir. 2013).  Similarly, courts have defined separate violations by the separate victims of a defendant's scheme.  See, e.g., Fowler, 6 F.4th at 264-65.

Courts have discretion to determine the appropriate amount of a civil penalty "in light of the facts and circumstances." SEC v. Rajaratnam, 918 F.3d 36, 44 (2d Cir. 2019) (citation omitted).  Courts often consider several factors in making this determination, including:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

Fowler, 6 F.4th at 266 (citation omitted).

O'Brien's manipulative trading scheme merits a Tier III civil penalty.  The scheme involved fraud, deceit, and manipulation and, at the very least, created a significant risk of substantial losses for investors.

A penalty of $10,315,065 falls within the maximum amount permissible under the relevant statutes.  $10,315,065 represents the gross amount O'Brien earned for the entire scheme for the

period alleged in the complaint.  Thus, even assuming that the scheme constituted only a single violation, the "gross pecuniary gain" from that violation represents $10,315,065.

Considering the factors relevant to the determination of civil penalties, awarding the full amount of the defendant's gross pecuniary gain is appropriate.  O'Brien's conduct was egregious.  His scheme was complex, required careful planning to execute, and consisted of over 18,000 discrete events of coordinated trading.  Likewise, the facts showing O'Brien's scienter are palpable.  For example, as explained further above, O'Brien acted to conceal the coordinated trading by using multiple accounts at different firms, disregarded the warnings of several brokerage firms, and obfuscated their attempts to understand his trading methods.  O'Brien's scheme also caused substantial losses to investors as he manipulated the prices of securities in several thousand coordinated trading events. Similarly, far from an isolated lapse in judgment, O'Brien's unlawful activity was recurring; the scheme lasted multiple years and even continued after O'Brien was alerted to the SEC's investigation.  Even after entering a Consent Judgment which precluded him from arguing that he did not violate the law as alleged in the SEC's complaint, he used the opportunity presented by the process to assess disgorgement and penalties to

deny that he had engaged in any violation.  Finally, O'Brien has made no showing that his financial condition warrants reducing the penalty.  Thus, all the factors point towards imposing a penalty equal to O'Brien's gross pecuniary gain of $10,315,065.

To the extent it may be relevant, an award of $10,315,065 is not disproportionate to the amount of disgorgement.  It is a fraction of the amount permitted if the maximum fine were calculated per violation.  That calculation would amount to fine of over $4.014 billion.

O'Brien's arguments that the civil penalty should be lower largely repeat his arguments regarding his liability and the appropriate amount of disgorgement.  For the reasons identified above, those arguments are meritless.

## Conclusion

The SEC's motion for monetary relief is largely granted.  O'Brien shall disgorge $5,197,322, plus prejudgment interest of $367,291.36.  Separately, civil penalties in the amount of $10,315,065 are imposed.  An Order accompanying this Opinion

sets a schedule for filing a proposed final judgment in this
action.

Dated:    New York, New York
          May 25, 2023

                                    _____
                                         DENISE COTE
                              United States District Judge

41